HORACE S. WADE, S. M. WADE, S. W. BEAUCLERK, MAY
F. BEAUCLERK, BY HER NEXT FRIEND,

*v.*

SIDNEY PULSIFER, EXR. AND GUARDIAN OF LIZZIE P. ALLEN,
AND LIZZIE P. ALLEN.

[IN CHANCERY.]

*Gifts set Aside, Donor and Donee Having Deceased. Gift
from Ward to Guardian Voidable. Multifariousness must
be met by Demurrer* in limine. *There can be no Con-
firmation of the Gift so Long as the Confidential
Relation Exists. Witness. Minor. Trust.
Equity. Jurisdiction.*

1. The gift from a ward to a guardian is voidable ; and the burden of proof is on the
   donee to show that the transaction was fair ; that it was freely, voluntarily
   and understandingly made ; and that the donor had competent and disin-
   terested advice *as to the subject-matter of the gift.*

2. Mere lapse of time,—in this case ten years,—is no protection to the guardian ; for, while it is proof of acquiescence and confirmation, there can be no confirmation by the donor without a knowledge of the invalidity of the gift, and of his righ t to set it aside ; and it is incumbent on the donee to establish such knowledge, not by guess work, but by substantial facts proved ; and, also, that the acquiescence was the free and intelligent choice of the donor, and not the product of the confidential relation.

3. The settlement and approval of the guardian's account by the Probate Court ; the presence of the wards, their husbands and attorney on that occasion, it not appearing that the subject-matter of the gift was up for consideration ; their receipts ; their expression of approval of the accounts ; their declarations that they did not regret the gifts ; lapse of time ; the death of the donee, and of one of the donors, do not affect the result ; and the gifts are set aside.

4. The objection to multifariousness must be taken by demurrer, and insisted on before final hearing ; and it cannot be made by answer.*

5. It is one of the most ancient and best settled rules that a Court of Chancery has jurisdiction and power to give relief against breaches of trust.

6. In a suit to set aside a gift induced by undue influence, the donee being dead, the donor, under our statute, is not a witness in his own behalf.

7. A minor's appointment of an attorney is void.

HEARD at the February Term, 1881, on bill, answer, replication and the report of special masters. Ross, Chancellor, ordered, *pro forma*, that the bill be dismissed with costs ; but that the temporary injunction stand during the appeal.  Hon. TIMOTHY P. REDFIELD and Hon. JONATHAN ROSS were appointed special masters, who found and reported substantially as follows :

Ira H. Allen, who resided in Irasburgh, in the County of Orleans, deceased on or about April 1, 1866.  He left quite a large estate.  He died intestate.  He had been twice married, his wives being sisters.  He left to share his estate, Frances E. Allen, his widow, Charles P. Allen, a son by his first wife, Sarah M. Allen, (now Sarah M. Wade), Mary Frances Allen, (subsequently married to the orator, Sidney W. Beauclerk), daughters by his then wife.  His estate was settled and distributed in due course of administration, to his widow, son and two daughters, the latter of whom were then minors.  Sarah M. was born October 18, 1850, and Mary Frances, July 31, 1854.  Heman S. Royce, Esq., was appointed by the Probate Court for the District of Orleans, where all the proceedings in regard to said estate, and other estates hereinafter mentioned were had, May 11, 1867.  On May 15,

---

* That the Court will hear *jurisdictional* questions, although not raised by the pleadings, see *Canfield* v. *Andrew*, *ante*, 12; and *Dumont* v. *Fry*, Reporter, May 31, 1882, p. 677, citing, 15 Wall. 211 ; 23 Wall. 466 ; 19 How. 271 ; Story on Eq. Pl. ss. 10, 481 ; 10 Wall. 299.—REP.

1867, he resigned said appointment, and their brother, Charles P. Allen was duly appointed their guardian, and continued to act in that capacity as hereinafter stated.

The widow, Frances E. Allen, received from her husband's, Ira H. Allen's estate, $85,327.18. She had no property except what she thus received. She died intestate at Irasburgh, March 1, 1867 ; and her estate was duly settled and distributed by said Probate Court, to her two daughters, Sarah M. and Mary Frances. Charles P. Allen was the administrator on her estate, and at the same time, guardian of Sarah M. and Mary Frances ; and so had all of his father's estate in his hands, including his own share, and the shares of his two sisters, Sarah M. and Mary Frances. The sisters gave but little attention to the settlement of their father's or mother's estate, or the management or control of the shares falling to them respectively, but left the same entirely to Charles P.,— to whom as an older brother they were much attached, and in whom they had great confidence,—until their marriage, January 2, 1872, when the said Sarah M. married the said Horace S. Wade, and the said Mary Frances married the said Sidney W. Beauclerk. Heman S. Royce, Esq., of St. Albans, married a sister of the wives of Ira H. Allen. After their mother's death, the daughters made their home with their aunt, Mrs. Royce, at St. Albans, although a considerable proportion of the time between the death of their mother and their marriage, they, and especially Sarah M., were attending school at Troy, New York. October 15, 1868, Sarah M. transferred to Charles P. Allen $14,209.84 of what had been distributed to her as part of her share of her mother's estate. The transfer is under seal and witnessed by her sister Mary F., and dated at St. Albans, Vt., and purports to have been made on the consideration of love and affection. A copy of the transfer accompanies this report and is made a part hereof.

February 27, 1869, Mary Frances transferred to said Charles P. Allen by a like instrument, and for a like consideration, $12,131.10 of her share in her mother's estate. This is also dated at St. Albans, Vt. Both transfers convey *choses in action*, mostly, if not entirely as set forth in the transfers, on which the interest was reckoned to September 15, 1868, the time when the estate of their mother was distributed to them by the Probate Court. At the time of the transfers the property was in the hands and possession of said Charles P., either as administrator of his stepmother's estate, or as guardian of his sisters.

Charles P., in his life time, and his estate since his decease, has never paid to his sisters or their representatives any portion of either of said sums, and the bill in this case is brought to en-

able said Sarah M., and the representatives of said Mary Frances, to recover said sums respectively, with the interest thereon from Sept. 15, 1868. It is objected by the defendants that said matters are separate and distinct, and that the orators cannot properly join in the prosecution thereof. This question is respectfully submitted to the Court of Chancery, if the masters have any proper cognizance of the same.

Sarah M. was nearly of age at the time she made said transfer, said transfer being made Oct. 15, 1868, and she having been born Oct. 18, 1850. The orators claim she became of age Oct. 18, 1868, and the defendants, October 17, 1868. Mary Frances made the transfer Feb. 27, 1869; was born July 31, 1854, and became of age as claimed by the orators, July 31, 1872, and as claimed by the defendants, July 30, 1872. Mary Frances deceased May 17, 1873, testate, and by her will gave three-fourths of her property to her husband, and one-fourth to her child, May F. Beauclerk. Her husband was nominated executor of her will; but on Charles P. Allen's intimating that he did not care to sign his bond, declined the trust, and Charles P. was appointed administrator with the will annexed, Aug. 11, 1873; and also appointed guardian of the child, May F., on the application of her father, Sidney W. Beauclerk, Sept. 17, 1873. Charles P. Allen married Lizzie Pulsifer of Peoria, Ill., Feb. 1, 1876, and died testate May 30, 1877. Heman S. Royce was appointed executor of his will. Aside from some small bequests, he gave the most of his estate, amounting to about $150,000 to his wife, Lizzie Pulsifer Allen, and his daughter, Lizzie Pulsifer Allen, who was born January 31st, 1877. His wife, Lizzie P. Allen died Aug. 4, 1877, testate, and appointed her father, Sidney Pulsifer, executor of her will. He is also guardian of the daughter, Lizzie P. Allen. By her will Lizzie Pulsifer Allen gave the most of her property to her step-mother, the wife of said Sidney, and to her daughter. The guardianship of Charles P. Allen of May F. Beauclerk continued until his decease, and his account as such guardian was settled by his executor, Heman S. Royce, May 30, 1878. L. H. Thompson, Esq., was appointed her guardian June 11, 1877, and has continued such until now. Charles P. Allen presented and had allowed his account as such guardian, Sept. 15, 1875, and at no other time. He duly settled his account as administrator of the estate of Mary Frances Beauclerk; commissioners were duly appointed on the the estate of Charles P. Allen, July 6, 1877, who in due course made their report to the Probate Court, and the same was accepted by the court May 18, 1878.

No claim was made by the said Sidney W. Beauclerk for the

claim now made by him against said Charles P. Allen, at the time he settled his administration account of Mary Frances' estate; nor to the commissioners on the estate of Charles P. Allen; nor did the guardian, L. H. Thompson, Esq., make any claim for his ward when said Royce settled the guardianship account of said Charles P. Allen of his ward, May F. Sidney W. Beauclerk and L. H. Thompson both knew of the transfer by Mary Frances to Charles P. Allen as early as January 1, 1872. Neither did the said Wade or his wife, the said Sarah M. make any claim to the commissioners on the estate of Charles P. Allen to be allowed the claim they now seek to recover in this action. Charles P. Allen filed with and had allowed him three separate accounts of his guardianship of Sarah M. Allen and of Mary F. Allen. His first account as guardian of Sarah M. Allen was allowed Sept. 10, 1869; and of Mary F. Allen was allowed Sept. 1, 1869. The accounting in each was brought down to Sept. 1, 1869. August 11, 1869, he caused to be recorded in the probate records the transfer of Sarah M. Allen to himself. Such record was on the page next preceding the one on which his first account with her was recorded. His second account with each was allowed Oct. 20, 1870, and brought the accounting down to that date. His third account with each brought the accounting to January 1, 1872, the day before their respective marriages; that with Sarah M., then Sarah M. Wade, was allowed, and the said Charles P. discharged by the Probate Court as guardian Feb. 6, 1872; and that with Mary Frances, then Mary Frances Beauclerk, was allowed as of Jan. 1, 1872; but the property was not passed over until Feb. 17, 1872. Before his third account with Sarah M. was allowed by the Probate Court, she and her husband procured Henry D. Hyde, Esq., an eminent lawyer from Boston, to come with them to Irasburgh, and there they spent several days in examining with reference to the property of Sarah M., and of the management and account thereof by Charles P., as guardian, and as administrator of Frances E. Allen's estate. They had full access to all the probate records in regard to the same. At the close of such examination, Feb. 6, 1872, they endorsed on the third account:

" The above account having been examined and approved by our attorney, Henry D. Hyde, we do hereby express ourselves as satisfied, and this account is settled as above. H. S. WADE,
SARAH M. WADE."

Thereupon the account was allowed by the Probate Court; and Charles P. discharged as her guardian, " when he shall have passed over the above property to Sarah M. Wade." At the close of the schedules is the following receipt:

" I have this day received of Charles P. Allen, my guardian, the full amount of my property, real and personal, as by his statement of account settled on the first day of January, 1872, and approved by me on the 6th of February, 1872 ; also have received all the money received by said Allen on my account, being the proceeds of my property aforesaid since said first day of January, 1872. Also received one thousand, one hundred and twenty dollars, being in lieu of one United States Five-Twenty Bond for the sum of one thousand dollars.

" SARAH M. WADE.

" Irasburgh, Vt., Feb. 8, 1872.
"Witness, HORACE S. WADE."

Before the allowance of his third account as guardian with Mary Frances, Charles P. drew up the same with the schedules as appears by the copy. He was aided in preparing both of said third accounts by L. H. Thompson, Esq. Said Thompson then learned of the transfer by Sarah M. and Mary Frances to Charles P. In schedule " A " of the personal property of the ward, attached to said account, is the following : " Notes assigned by Mary to me on 21st February, 1869, put into this schedule because said assignment is voidable till Mary becomes of age, Andrew J. Bean, $4160 ; Seaver & Bean, $2,153.90 ; J. B. Fassett, $1,313.25 ; Bignall Hunt, $1,574.25=$9,200.40. D. M. Walker, $1,189.30 ; F. Tarble, $701.57=$1,890.87."

If the copy is correct it appears that the note assigned against Mary E. Furman, $1,038.83, was omitted in the above list. With the account and schedules thus prepared, Charles P. went with E. A. Stewart, who was then judge of probate for the district of Orleans, and Henry Somers, to St. Albans ; and on Jan. 1, the day before her marriage, met her and her intended husband at the house of her uncle, H. S. Royce, Esq. Mary F. there recognized Mr. Stewart as being there in her interest, and as acting for her. Mr. Somers went at the request of Charles P. to inform Mary as to the value of the farms on which the mortgage notes were secured, and of the real estate generally in Irasburgh. He was well acquainted with such property and of good judgment in relation thereto. Mr. Stewart had been shown and examined the account and schedules before going to St. Albans, and had concluded in his own mind to allow the same.

When at St. Albans Mr. Stewart was given the power of attorney from Mary F., a copy of which precedes the account on the record, and in the certified copy thereof. Said Charles P., Mary F., Sidney W. Beauclerk, Stewart and Somers sat down and spent most of the day in examining said account and schedules, and in explaining and making and answering inquiries in regard thereto.

Her uncle, his wife and daughter, Sarah M. and H. S. Wade were in and out of the room. Somers gave his judgment of the value of the securities and other property. Stewart acted for Mary F., and inquired into the various items, as did said Beauclerk and Mary. Said Stewart cannot now say that anything in particular was said about that part of the schedule which refers to the notes assigned to Charles P. He knew of said assignment or transfer before going to St. Albans. No dissatisfaction was expressed by Mary F. or Mr. Beauclerk in regard to the account or anything connected therewith. It is evident that Mary F. had all the confidence of a younger sister in her brother Charles P. After the examination, Judge Stewart allowed the account as shown; and and also endorsed thereon: " The above account having been examined and approved, the same is settled as above and Charles P. Allen discharged as such guardian."

E. A. STEWART, Att'y for Mary F. Allen.

In February, 1872, Charles P. Allen passed over to Mary F. all the property named in the schedules except what she had assigned to him, and she gave him a receipt as follows:

" I have this day received of my trustee, Charles P. Allen, the full amount of all my property, real and personal, as by my settlement with him as guardian, said settlement having been made on Jan. 1, 1872; also received the full amount of all money received by said Charles P. on my account subsequent to Jan. 1, 1872.     MARY F. BEAUCLERK.

" Irasburgh, Vt., 17th Feb. 1872.

     " In presence of

          " SIDNEY W. BEAUCLERK.

" I hereby agree to the above settlement and transfer.

          " SIDNEY W. BEAUCLERK."

There was no evidence that Sarah M. or Mary Frances, after attaining majority, ever talked with Charles P. Allen in regard to their transfer to him. In the summer of 1872, from the last of May to about the middle of September, Mr. and Mrs. Wade and Mr. and Mrs. Beauclerk were boarding at the hotel in Irasburgh, kept by E. W. Powell. Mrs. Powell did their chamber work; and on one occasion during that summer, when she went to Mrs. Wade's room for that purpose, Mrs. Wade and Mrs. Beauclerk were talking about their gift to Charles P. Mrs. Beauclerk said she wanted Charlie to have just as much as she did; and Mrs. Wade said, " I don't regret it now." Mrs. Wade, when on the stand, as hereinafter stated, denied this conversation, or said she had no recollection of it and did not believe she had it. But the witness appeared impartial; and stated the conversation, and

what made her remember it in such a way that the masters think it is much more improbable that Mrs. Powell should have manufactured her testimony or have been mistaken about it, than that Mrs. Wade should have had it and have forgotten it ; and so find that the conversation occurred. The witness could not state whether this was before or after Mary Frances attained her majority. But after she attained her majority, on several occasions, and especially about the time she left the hotel, about September 10th, Mrs. Beauclerk talked with Mrs. Powell about Charlie, as she called him, and his poor health, and said if he should die, that she should not wish to live, and said that she wanted Charlie to have as much as she did. There was no evidence that either of said sisters or their representatives ever, before the bringing of this bill, called upon Charles P. or his representatives to refund said sums assigned or any portion thereof. There was no evidence as to what transpired between Charles P. and Mary Frances at the time she executed the transfer of Feb. 27, 1869. The orators offered Mrs. Wade as a witness as to what Charles P. said at the time she executed the transfer of Oct. 15, 1868. The defendants objected to her testifying, inasmuch as Charles P. had deceased. The masters were of opinion the objection was well taken ; but heard the witness subject to the defendants' exceptions ; and on her testimony find the following facts : On Oct. 15, 1868, Charles P. Allen came to the witness in her sister's room, at her uncle's at St. Albans, with the assignment or transfer written, and in her sister's presence, said to her that inasmuch as all the property came from their father, and he had the trouble of the entire care of it, he ought to be made equal with the witness and her sister, and asked her to sign the transfer, and she did so without giving much attention to the contents of the paper, or making much investigation or inquiry as to the reason why he did not receive as much as she and her sister did. She was made fully aware that he did not receive so much as she and her sister, and that the paper she signed would make him receive about the same amount of property that she did so far as she could do so. It is quite probable that the cause of the inequality was more fully explained and understood than the witness now remembers. None of the notes or evidences of the debts transferred were present at the time. Afterwards the subject was never alluded to between her and her brother, nor was her right to annul the gift thus made, until about the time this bill was brought, upon an occasion when her uncle and aunt, H. S. Royce and his wife, were in Boston at the witness's house, and they with her husband were discussing her right to make the gift. It was not claimed that Charles used

any fraud or misrepresentation to obtain the transfer or gift. She never consulted any one in regard to the same until the time spoken of. The witness claims she did not, at the time she made the assignment, know that Charles was having pay for caring for her property. She may not at that time, as he had not made any settlement of his guardian account at that time, but must have known it herself or through her attorney, Mr. Hyde, before, or at the time of the final settlement in February, 1872. The masters do not in the least discredit the statement of the witness, when on the stand ; but, considering the lapse of time, and other circumstances, as well as what the witness stated, are fully persuaded that Charles P. fairly and fully stated to the witness the reason for his asking for the transfer, and that the witness freely and understandingly signed the transfer.

There was an ante-nuptial contract between Mr. and Mrs. Wade, and between Mr. and Mrs. Beauclerk. After their marriage and the passing over of their property by Charles to Mrs. Wade and Mrs. Beauclerk, as shown by their receipts, they managed their property with the aid of their husbands and L. H. Thompson, Esq., who has been the general attorney of Mrs. Wade ever since ; and was the like attorney of Mrs. Beauclerk during her life, and since her decease, of Mr. Beauclerk in all matters relating to the management of said property. Mr. Beauclerk was allowed also to testify against the same objection of the defendants as relates to Mrs. Wade. But no special fact was developed by his testimony except that he took no very active part in the settlement of Jan. 1, 1872, nor in the subsequent management of his wife's property because of the ante-nuptial contract. His testimony shows that Charles P. had more or less control of his wife's property after the receipt of February 17, 1872. From Charles's knowledge of the property, and the relations between him and his sisters, the masters are persuaded that he advised with and aided them more or less, about their property, so long as Mary lived ; and Mrs. Wade so long as he lived.

.    .    .    .    .    .    .

All the papers connected with the settlement of said estates and of the guardianship of Charles P., so far as they relate to Sarah M., were submitted to and were fully examined by Henry D. Hyde, Esq. From all the foregoing facts the masters think it is fairly inferrible, and they find that Sarah M. and Mary Frances were fully and fairly informed by Charles P. of their right to the property assigned ; and that they each were making a gift of so much of their property to him ; that each made her gift understandingly, voluntarily, and without any undue advantage taken

of her by Charles P.; that Mary Frances fully acquiesced in the same until the time of her decease, and had no desire to recall the same; that Sarah M. fully acquiesced in the same so long as Charles lived; and that if he had outlived both, neither would ever have thought of recalling the gift from him.

The defendants insist that the orators have not brought the necessary parties before the court; and that no decree can be made, for that reason. It appeared that due notice was given that H. S. Royce, Esq., would present his administration account to the Probate Court Dec. 19, 1878. He did so on the day appointed. Mr. Sidney Pulsifer appeared, and the account was looked over and allowed. Mr. Royce then produced the bundle of notes, certificates of bank stock, government bonds, &c., and threw it on the Judge of Probate's table and said, " I am done with the Estate." Mr. Pulsifer said nothing and did not know but it was proper for the executor to pass the property over to the court. Mr. Royce then said to Mr. Pulsifer, " You want this figured up to have a distribution made, and you had better get Judge Thompson to do it." Judge Thompson remarked, " No doubt payments have been made that are not endorsed and parties hold receipts." Mr. Pulsifer said all he wanted was what was right, and if anything of the kind arose, to allow them. He and Mr. Royce soon left. It was understood Judge Thompson was to figure up the estate and make a decree of distribution. He told them he had business on hand so that he could not do so for some little time. Not long after, Mr. Royce gave Mr. Thompson a check for the cash that was found in his hands, amounting to $2,166.15. Mr. Thompson sent it to Mr. Pulsifer. It ran along in this shape until this suit was brought, no decree of distribution having been made, with all the evidences of indebtedness and indices of property of the estate remaining in Judge Thompson's hands for the purpose of ascertaining the amount of the estate. By the injunction no decree could be made, and Mr. Pulsifer could not take possession of the property and the property has remained and still is in the hands of Judge Thompson, and he has managed it. He has, however, been careful to obtain the consent of Mr. Royce, and Mr. Pulsifer both, to everything he has done.

Under these facts the defendants insist that the legal custody of the estate is in the executor, H. S. Royce, Esq., and that no proper decree can be made in the case without making him a party defendant. This question is submitted to the Court of Chancery.

Several amendments were made to the report by the masters, among them the following:

There was no evidence that the assignment from Mary Frances as a whole or separate instrument, was ever recorded in said probate records. The third account of Charles P. Allen, as her guardian, was recorded, and whatever is therein said, as set forth in our report, in regard to the assignment. . . . .

The facts and evidence on which the masters find that Mr. and Mrs. Wade, Mr. and Mrs. Beauclerk acquiesced in the gifts to Charles P., are, so far as we now remember, stated in the report.

If it is for the court rather than the masters to find the fact of acquiescence from the facts stated, the masters most respectfully submit the finding of that fact to the court.

The orators excepted to the report on the ground that the findings were contrary to law and the evidence, as appears by the report; the defendants excepted, because Mrs. Wade and Mr. Beauclerk were allowed to testify.

### ASSIGNMENT.

"St. Albans, Vt., Feb. 27, 1869.

"I, Mary F. Allen, of St. Albans, County of Franklin, and State of Vermont, for the consideration of love and affection, hereby assign and transfer unto Charles P. Allen, of Irasburgh, County of Orleans, State aforesaid, one-third part of the property assigned to me in the distribution of the estate of my mother, Frances E. Allen, by commissioners of distribution of said estate—N. T. Sheafe, Henry Cutler and Amory Davison, Jr., commissioners,—by their report dated Sept. 15, 1868, and recorded in the probate office in said Irasburgh, said property hereby transferred being particularly described as follows, viz: the following described promissory notes: . . . .

"Reference being made to said report for more minute description.

"It is intended that this assignment shall have effect to convey said property to said Charles at the time at which I received the same by said report, together with all interest accrued thereon.

"Signed,                MARY F. ALLEN.   L. S.

"In presence of"

The assignment from Sarah M. Allen was similar to Mary's.

### POWER OF ATTORNEY.

"I, Mary F. Allen, hereby constitute and appoint E. A. Stewart, Esq., of Derby, to be my lawful attorney for the following purposes, to wit: To examine and settle accounts with Charles P. Allen, my guardian, and for me and in my name to give him a final discharge of all his liabilities to me, my heirs, executors, administrators or assigns.

"St. Albans, 26th Dec., 1871.                MARY F. ALLEN.

"Attest, SIDNEY W. BEAUCLERK."

The answer, after stating in what respect the bill is multifarious, contained the following :

And that the said bill is altogether multifarious as appears from the plaintiffs' own showing ; and the defendants therefore claim that for this reason the plaintiffs cannot sustain said bill ; and these allegations the defendants make in bar of the plaintiffs' bill, and pray that they may have the same benefit therefrom as if they had formally demurred to said bill.

The following receipt was recorded in the records of the Probate Court :

"IRASBURGH, 18th September, 1873.

" Received of Charles P. Allen, administrator of the estate of Mary F. Beauclerk, fifteen hundred, fifty-nine dollars, ninety-four cents, being the cash in his hands belonging to me, of said estate; also received all the notes, accounts, and other personal property belonging to me, of said estate, of every description. Also received fifty-three dollars and fifty-four cents, rent rec'd of Charles Kidder, since settlement of said Allen's account as administrator, and not accounted for in said account.

"SIDNEY W. BEAUCLERK.

" Received on file Sept. 18, 1873, and ordered recorded.

"E. A. STEWART, Judge.

" A true record,—Attest, E. A. STEWART, Judge."

*H. S. Royce* and *L. H. Thompson*, solicitors for the orators.

The guardian had no right to accept a gift from his wards until after they had attained their majority, and his business relations and influence growing out of his guardianship had fully terminated, and they became fully informed as to their rights, and he stood to them exactly in the same position a stranger would have occupied, so that he would have no advantage whatever from his superior knowledge of their property, and his former relation as guardian to them. 3 Leading Cases in Eq., (3d Am. ed.) 114, 115, 138, 141, 143 ; 1 Story's Eq. Jurisp., (6th Amer. ed.) sec. 317–320 ; Adams's Equity, (6th Am. ed.) 380 ; *Hylton* v. *Hylton*, 2 Ves. sr. 547 ; *Hatch* v. *Hatch*, 9 Ves. Jr. 291, (Sumner's ed.) also note p. 298 ; *Pierce* v. *Waring*, 1 P. Wms. (6th ed.) p. 121, cited in Cox's note ; *Griffin* v. *Deveuille*, 3 P. Wms. 131, cited in note to *Osmond* v. *Fitzroy ; Wright* v. *Proud*, 13 Ves. Jr. 136 ; *Wood* v. *Downes*, 18 Ves. Jr. 125 ; *Thornber* v. *Sheard*, 12 Beav. 589 ; *Hoghton* v. *Hoghton*, 15 Beav. 299 and 300 ; *Eberts*

v. *Eberts*, 55 Penn. St. 119 ; *Waller* v. *Armistead*, 2 Leigh 11 ; *Archer* v. *Hudson*, 7 Beav. 551 ; *Galatian* v. *Cunningham*, 8 Cow. 372, 375, *et seq. ; Garvin* v. *Williams*, 44 Mo. 468 ; *Greenfield's Est.*, 14 Penn. St. 505 ; Hill on Trustees, (4th Am. ed.) 245, 246. In Perry on Trusts, sec. 200, it is said that, while the relation of guardian and ward actually subsists, no contracts can be made between them. *Lee* v. *Graham*, 6 Dana, (Ky.) 176, *et seq. ; Hoffman Steam Coal Co.* v. *Cumberland Coal & Iron Co.*, 16 Md. 507, 508 ; Schouler's Dom. Rel. 512 ; *Huguenin* v. *Basely*, 3 Lead. Cas. Eq. (4th Am. ed.) 94 ; s. c. 14 Ves. Jr. 273 ; Kerr on Fraud and Mis. 177 ; *Walker* v. *Walker*, 101 Mass. 169 ; *Revett* v. *Harvey*, 1 Lim. & Stu. 503. Unless the donee overcomes the presumption of undue influence, equity refuses to uphold such a transaction between parties standing in the relations named. 2 Lead. Cas. in Eq., (4th Am. ed.) Pt. 2, pp. 1193, 1196, 1213, 1216, 1228 ; 3 Lead. Cases, (3d Am. ed.) 139, 141, 143 ; *Wood* v. *Downes*, 18 Ves. Jr., 120 and note 1, p. 130. *Mott* v. *Harrington*, 12 Vt. 199, cites with approval *Wood* v. *Downes ;* and lays down a much stricter rule between attorney and client than stated above. *Rhodes* v. *Bates*, 1 L. R., Ch. App. 256, 259 ; *Greenfield's Est.*, 14 Penn. St. 505 ; *Archer* v. *Hudson*, 7 Beav. 551 ; *Cooke* v. *Lamotte*, 15 Beav. 240 *et seq. ; Hoghton* v. *Hoghton*, 15 Beav. 298, *et seq. ; Eberts* v. *Eberts*, 55 Penn. St. 119 ; *Todd* v. *Grove*, 33 Md. 192, *et seq. ; Garvin* v. *Williams*, 44 Mo. 468 ; *Bellage* v. *Southee*, 9 Hare, 534 ; *Bergen* v. *Udall*, 31 Barb. 21 *et seq. ; Pairo* v. *Vickery*, 37 Md. 484 *et seq.*

Equity raises the presumption in a transaction between parties standing in the relations to each other in which Charles P. and his sisters stood, that the conduct which is claimed to amount to ratification or acquiescence was induced by the *same influence* that procured the original gift, and the *burden* is on the defendants to overcome this presumption. 2 Lead. Cas. in Eq., (4th Am. ed.) Pt. II. 1263 ; *Long* v. *Mulford*, 17 Ohio St. 484 ; *Waters* v. *Thom*, 22 Beav. 559 ; *Curtin* v. *Patton*, 11 Serg. & Rawle, 310, 311 ; *Hinely* v. *Margritz*, 3 Penn. St. 428 ; *Lessee of Drake* v. *Ranney*, 5 Ohio, 255, 256 ; *Lee* v. *Graham*, 6 Dana, (Ky.) 181 ; *Adair* v. *Brimmer*, 74 N. Y. 554 ; *Fish* v. *Miller*, 1 Hoff. Ch.,

279, *et. seq.* ; *Hoffman Steam Coal Co.* v. *Cumberland Coal &* *Iron Co.*, 16 Md. 508, 509 ; *Cumberland Coal & Iron Co.* v. *Sherman*, 20 Md. 134 ; *Pairo* v. *Vickery*, 37 Md. 486, *et seq.* ; *Cockerell* v. *Cholmely*, 1 Russ. & Mylne, 425 ; Kerr on Fraud & Mis. 300, 301 ; *Micon* v. *Lamar*, 9 Reporter, 401 ; *Sims* v. *Everhard*, 10 Reporter, 713 ; s. c. 102 U. S. 311.

The orators claim that as there is no dispute about the facts, it is solely a question of law for the court to determine from the facts stated, whether there has been acquiescence or not. 1 Greenl. Ev. (12th ed.) sec. 197 a. ; *Nash* v. *Harrington*, 2 Aik. 11 ; *Cayuga Co. Bank* v. *Warden*, 6 N. Y. 29 ; *Healey* v. *Utley*, 1 Cow. 352 ; *Dole* v. *Gold*, 5 Barb. 490 ; *Farmers' Bank* v. *Vail*, 21 N. Y. 486 ; *Tracy* v. *Atherton*, 36 Vt. 512.

The receipts do not estop the wards. *Hall* v. *Cone*, 5 Day, 543 ; *Waller* v. *Armistead*, 2 Leigh, 11 ; *Sullivan* v. *Blackwell*, 28 Miss. 737 ; *Musser* v. *Oliver*, 21 Penn. St. 362 ; *Thornber* v. *Sheard*, 12 Beav. 589 ; *Eberts* v. *Eberts*, *supra* ; *Lee* v. *Graham*, 6 Dana, (Ky.) 181 ; *Felton* v. *Long*, 8 Ired. Eq. 224.

Again, while Charles P. retained the entire estate of his wards in his hands, and acting as their guardian, had the exclusive control and management of the same, no inference of acquiescence can arise at law or in equity. He retained the entire property of Mary F. until Feb. 17, 1872, and the entire property of Sarah M. until Feb. 8, 1872. *Greeley* v. *Mousley*, 4 De Gex & Jones, 95.

From January 2, 1872, Sarah M. and Mary F. were both under coverture. *March* v. *Russell*, 3 M. & Cr. 32 (14 Eng. Ch. R). ; *Steel* v. *McKnight*, 1 Bay, (S. C.) 64 ; *Felton* v. *Long*, 8 Ired. Eq. 228 ; *Hatch* v. *Hatch*, 9 Ves. Jr. 298.

*Edwards, Dickerman & Young*, for the defendants.

The defendants claim in this case that Sarah M. and Mary Frances made assignments of the property named therein to Charles P. Allen for the consideration therein named, and that Sarah M. and Mary Frances were fully and fairly informed by Charles P. of their right to the property assigned, and that they each were making a gift of so much of their property to him ; that each made her gift understandingly, voluntarily and without any undue ad-

vantage taken of her by Charles P.; that Mary Frances fully acquiesced in the same until the time of her decease, and ratified the same, and had no desire to recall the same; that Sarah M. acquiesced in the same so long as Charles P. lived; and ratified the same; and that she is estopped from making any claim by her acquiescence in and ratification of said gift, and by failing to make any claim for the same within a reasonable time; that Beauclerk is estopped to claim the gifts.

The assignments by Sarah M. and Mary Frances to Charles P. were not void but only voidable, and therefore susceptible of confirmation or ratification when they came of age. *Eagle Fire Co.* v. *Lent,* 6 Page Ch. R. 635; *Zouch* v. *Parsons,* 3 Burrow, 1794; 1 Story's Eq., s. 345 and note 2; 1 Story's Eq., s. 241; *Tucker et al.* v. *Moreland,* and *Vase* v. *Smith,* 1 Am. Lead. Cases, pp. 230, 242 and 247, notes; Tyler on Inf. & Cov., ss. 15 and 16, and authorities there cited; *Persons* v. *Chase,* 37 Vt. 648; 2 Kent's Com., pp. 234, 235, 236, note g, 239; the case of *Bigelow* v. *Kinney,* 3 Vt. 353, shows how the acts or contracts of infants may be ratified; *Orvis* v. *Kimball,* 3 N. H. 314. Every contract of an infant, merely voidable, will bind him, after becoming of full age, unless he disaffirm it, within a reasonable time after becoming of age. *Richardson* v. *Boright,* 9 Vt. 368; *Bigelow* v. *Kinney,* 3 Vt. 353. And so with reference to the appointment of Judge Stewart to settle Charles P. Allen's account as guardian of Mary Frances at St. Albans—said appointment was in writing and not under seal, and recorded with said account. Tyler on Inf. and Cov., ss. 16, 18; *Whitney* v. *Dutch,* 14 Mass. 463; 20 American Jurist, 255–6; 5 Bacon's Ab. 132 (Ed. by Bouv.), 140, 141, 143; Swift's Dig. 55; 8 Coke, 43; *Roberts* v. *Wiggin,* 1 N. H. 73; 2 Kent Com. 237. See note A on page 238 and text; Tyler on Inf. & Cov., ss. 19, 22, 23, 24, 27, 28, 29, 30; *Curtis* v. *Patton,* 11 Sarg. & Rawle, 305, 310; *Kirby* v. *Taylor,* 6 Johns. Ch. 242. As to confirmation after becoming of age. Tyler on Inf. & Cov., s. 41; 6 Conn. 494; 3 Vt. 360; *Richardson* v. *Boright,* 9 Vt. 368; *Forsyth* v. *Hastings,* 27 Vt. 646; 2 Kent Com. 238; 1 Am. Lead. Cases, 254; *Morse* v. *Royal,* 12 Vesey, 355; 1 Swift's Dig. 59. After becoming of age one may take a course which

will estop him from denying that his acts while an infant have been confirmed.    Tyler on Inf. & Cov., s. 54 ; *Goode & Bennion* v. *Harrison*, 7 E. C. L. 89 ; *Farr* v. *Sumner*, 12 Vt. 28.

The case of *Boynton* v. *Dyer*, 28 Pick. 1, shows that Sarah M. is estopped by reason of her deliberate settlement of Charles P's guardian account and her certificate and receipt connected therewith, after she had been of age more than three years.

After Sarah M. became of age her guardian was discharged ; but if this is not so, he was in any event discharged when he settled his guardian account.    *Probate Court* v. *Child*, 51 Vt. 82 ; *Allen* v. *Tiffany el al.*, 6 Reporter, 104.

Acquiescence in a transaction may bar a party of his relief in a very short period.    Perry on Trusts, ss. 870, 868, 865, 864, 1862 ; 12 Am. L. Reg. 468 ; 2 Ves. Jr. 280 ; 14 Allen, 516.

The Statute of Limitations is a good plea.    Story Eq. Jurisp. s. 64, a ; 9 Pick. 244 ; 7 Johns. Ch. 90, 114 ; *Stanford* v. *Tuttle*, 4 Vt. 82, also 491 ; *Spear & Carlton* v. *Newell*, 13 Vt. 293 ; *Thorp* v. *Thorp*, 15 Vt. 105 ; *Fletcher* v. *Warren*, 18 Vt. 48 ; *Aarons* v. *Mendel*, 9 Reporter, 783.

A settlement between guardian and ward made in good faith and on full deliberation cannot be impeached after the decease of the ward.    *Hawkins's Appeal*, 32 Penn. St. 263.

There has been no fraud and no concealment of facts by the guardian.    After the ward becomes of age, the fiduciary relation of guardian ceases, and they occupy that of debtor and creditor as to the Statute of Limitations. *Bull* v. *Towson*, 4 W. & S., 557 ; *Bourn's Appeal*, 27 Penn. St. 492.    This is fully shown by the cases of *Field & Wife* v. *Torrey*, 7 Vt. 372, and *Harris* v. *Harris*, 44 Vt. 320.

We insist that the petitioners had a full remedy at law, and that the Court of Chancery had no jurisdiction.    *Harris* v. *Harris*, 44 Vt. 320 ; *Currier* v. *Rosebrooks*, 48 Vt. 34 ; *Merriam, Admr. de bonis non*, v. *Hemenway et al.*, 26 Vt. 565 ; *Heirs of Adams* v. *Adams et al.*, *Admrs.*, 22 Vt. 50 ; *Adams* v. *Adams*, 21 Vt. 166 and 167.

H. S. Royce, was executor of Charles P. Allen, and as such settled said Allen's guardian account of May F. Beauclerk (the

infant), with the Probate Court, the guardian of said infant, L. H. Thompson, being present and participated in the settlement. This is conclusive as to the infant, May F. Beauclerk, and this estops her and her representatives from making this claim. *Waterman, Guardian,* v. *Wright,* 36 Vt. 164 ; *Wing* v. *Rowe,* 8 Reporter, 462 ; 69 Me., (Sup. Ct., 1879) ; *Allen* v. *Tiffany et al.,* 7 Reporter, 104 ; California, 104.

The bill is multifarious ; and the defect may be met by answer. 50 Vt. 22 ; Story Eq. Pl., s. 279 ; 9 Reporter, 411 ; 8 Reporter, 392 ; Daniell Ch. P. & P. 344, c. 6, s. 4 ; Mitf. & Ty. Pl. 18.

The opinion of the court was delivered by

POWERS, J.  Courts of equity look with a jealous eye upon all dealings between persons sustaining confidential relations to each other.  They will not allow guardians, trustees, attorneys or other persons, whose duty it is to guard the interests of others to reap any advantage from the trust relations.  They will not allow the promptings of self-interest to come in conflict with the requirements of duty.

This rule does not rest upon the theory that any actual fraud is present in the particular transactions ; but upon the broader ground that in such relations no opportunity to commit fraud shall be tolerated.  The *chance* to do a wrong is the "*fons et origo malorum.*"  The jurisdiction of courts of equity to set aside dealings in cases of this character, has long been established ; but the courts have always been careful not to fetter their jurisdiction, by defining the exact limits of its exercise.

At the time the gifts were made in this case, Sarah M. and Mary F. Allen were both minors, and Charles P. was their legal guardian.  In addition to the influence incident to this relation, Charles P. sustained the nearer and more potential relation of a brother, enjoying the unlimited confidence and affection of his sisters.  The father and mother had both deceased, leaving Charles as the substantial head of the family.  The girls, undoubtedly, had but little practical knowledge of the large fortune left them by their father, nor of the very considerable additions made to it by the death of their mother.  Charles held in his hands the

entire estate that came from both sources; and controlled and managed the same at his own will, doubtless, without consultation with his sisters or any one acting in their behalf. The most that is learned respecting the circumstances under which the gifts were made, comes from the testimony of Sarah, who details the circumstances under which hers was made. We have no information as to what was said to, or by Mary, when she made her gift; but the instrument attesting it would raise the inference that is was brought about substantially as Sarah's was. Charles being dead, it is apparent that Sarah's testimony, respecting the details of the transaction by which she turned over to Charles a portion of her estate which she now seeks to recall, cannot under our statute be used. The exclusion of her testimony, however, does not we think aid the defendants. It is an universal rule that a guardian seeking to hold a benefit conferred by his ward, takes the burden of showing that the ward, with full knowledge of the character of the act he was doing, freely and voluntarily made the gift. Kerr on Fraud and Mistake, 151. In the absence of such proof, the presumption arises that the gift was prompted by the influence and pressure of the confidential relations subsisting between the parties. And the scrutiny which courts apply to *gifts* in such cases is more searching than in cases of *contracts* made between the parties.

Bispham's Equity, 3d ed. 291 : " The relation of guardian and ward is one in which the presumption (of undue influence) exists, perhaps in the highest degree, and a transaction between persons thus situated during the continuance of the relationship, and especially if it takes the form of a gift, can rarely, if ever, stand." Bispham's Equity, 294.

Therefore discarding the testimony of Mrs. Wade, the case is barren of facts tending to show that these wards made the gifts voluntarily or understandingly. It is true that the masters say on page thirteen, printed report, that " considering the lapse of time and other circumstances as well as what the witness (Mrs. Wade) stated, they are fully persuaded that Charles P. fairly and fully stated to the witness the reason for his asking for the

transfer, and that the witness freely and understandingly signed the transfer."

Eliminating from this summary of the grounds upon which the masters base their conclusions, the testimony of Mrs. Wade which they had no right to weigh, and the conclusion to which they arrive is left to stand upon "lapse of time" and "other circumstances." But lapse of time is no evidence that Charles imparted to Sarah the reason for soliciting the gift, nor that she understandingly and freely made it. Indeed, as we have seen, when the relation of guardian and ward is shown to exist, the presumption at once arises that the gift was not freely made. And it is equally true that *time* never puts an end to this presumption. Lapse of time might support a claim that Sarah had acquiesced in the transaction if it had been followed by a long delay, unexplained, before she called it in question. But acquiescence is not predicable of a valid gift; such gifts are always good. It is only when the gift is originally voidable that it is made irrevocable by acquiescence. The protection afforded by lapse of time therefore, can be invoked only, when the original gift was *not* freely and understandingly made. There are no "other circumstances" in the case that throw any light whatever upon the manner in which the gifts were originally made.

Accordingly, by force of the rule above cited, which calls upon the guardian to supply this proof, the presumption of undue influence arises, and the gifts must be treated as voidable when made, and as voidable now unless they can be supported upon the ground of acquiescence. In the consideration thus far given to the transactions in question, no prominence has been given to the fact that the girls were minors when the gifts were made; because the age or capacity of the persons making the gift is of little importance in cases where a confidential relation exists. It is not the incapacity of *infancy*, but the incapacity of *wardship* that enables these girls to complain. It is not a question involving dealings between an infant, incapable of binding himself, with an adult, who may be bound. It is a question between a ward who is incapable of giving, and a guardian incapable of accepting. The relation between the parties thus creates a mutual disability.

The disability would exist all the same if both parties were of full age and unquestioned capacity.

The presumption that arises from the relation of the parties, that the gifts were not originally freely and understandingly made, but were the result of pressure, is so inexorable, that no loss of evidence that would support their validity will induce the court to waive or bend the rules. Says Turner, L. J., in *Gresley* v. *Mousley*, 4 DeGex & Jones, 98, speaking of the validity of dealings between solicitor and client: " Solicitors who deal with their clients must take care not only that the transaction is fair, but that they are *in a condition to prove that it was fair.*" In the case just cited decided in 1859, a transaction between a solicitor and his client was set aside on a bill filed two years after the death of the solicitor and nearly eighteen years after the death of the client. This case is adopted as the true rule in Kerr, F. and M. 307 ; has been often cited with approval in later English decisions, and is now the unquestioned law upon the subject. Some members of the court are inclined to hold, in consonance with some of the early cases, that these gifts are absolutely void, and so incapable of confirmation. But the better rule deducible from the cases is, that though *prima facie* void, they may be confirmed by the subsequent acts or conduct of the wards.

The question then arises whether these gifts have been confirmed, or so long acquiesced in, as to bar the orators of the relief they seek. It is not claimed that the wards have done any affirmative act expressly confirming the gifts. But it is said, that, by reason of the lapse of time, the examination made by the wards of the guardian's accounts with the aid of their husbands and attorneys, their declarations in the presence of Mrs. Powell, and other facts and circumstances referred to in the report, the wards are now concluded on the ground of acquiescence from questioning the defendants' rights to retain the gifts.

This defence is met by the orators with the claim that during all the time since the final settlement of the guardianship accounts both wards have been married women. " One under a disability cannot be presumed to have released a right." 2 Perry on Trusts, 2d ed., s. 867.

In this case, however, it is to be noted, that both wards, after their marriage, held their property as their own separate estate, and in equity could deal with the same, as freely as they could if unmarried. It is not apparent, therefore, why they might not, as to such estate, be bound by acts of confirmation or by acquiescence as effectually as if sole. 1 Perry on Trusts, s. 467 ; 2 Ib. s. 849.

Acquiescence is matter of defence. It is not a line of conduct that, by relation back, makes the gifts valid *ab initio ;* but is a state of facts arising *ex post facto,* that enables the defendant to say that no *remedy* is available to the claimant to *set aside* the gift. Hence the burden of proof to show acquiescence is upon the person claiming to hold the gift. Kerr, Fraud and M., 301. And this burden is discharged not by guesswork ; but substantial facts must be *proved,* or the defence fails. To make out the defence it must be shown, 1st, that the wards *knew* that the gifts were invalid, and that they have the right to set them aside ; 2d. that knowing these facts they have consented for an unreasonable time that the gifts might stand unquestioned ; and 3d, that this consent is the result of their free and intelligent choice and not the product of the pressure and influence of the confidential relations existing between the parties.

I. The wards must know that the gifts were invalid and their right to have the property restored to them.

"A man cannot be said to acquiesce in what he does not know, nor can he be bound by acquiescence unless he is fully apprized as to his rights, and all the material facts and circumstances of the case." Kerr, Fraud and Mistake, 300.

In *Stump* v. *Gaby,* 2 De G. M. & G. 623, 631, the Lord Chancellor, speaking of an alleged confirmation of former dealings between an attorney and his client, says : "The attorney has to show that the confirmation was made by the client with a full knowledge of his rights to set aside the conveyance."

Lord WESTBURY uses similar language in *Farrant* v. *Blanchford,* 1 De G. J. & S. 118. Lord REDESDALE in *Murray* v. *Palmer,* 2 Sch. & Lef. 474, has epitomized the doctrine of the cases as follows : "Now I take it that nothing will amount to a confirma-

tion of a fraudulent transaction but an act done by the party *after he has become fully aware* of the fraud that has been practiced; . . . he *must be aware* that the act he is doing is to have the effect of confirming *an impeachable transaction.*" In *Kempson* v. *Ashbee*, 10 Chan. App. 15, Lord CAIRNS lays down the same rule. Applying this rule to the facts reported, we shall see that the defence of acquiescence cannot be sustained ; that no one of the three enumerated conditions by which it is to be upheld, exists in the case.

We start in this inquiry without any evidence that the wards understandingly made the gifts in the first instance. The masters say that there was no evidence that Sarah and Mary ever talked with Charles after coming of age in regard to these gifts ; and as to Sarah, that she never consulted any one in regard to her gift or her right to annul it until a short time before this suit was brought.

The case is entirely barren of facts to show that the girls were ever informed by their husbands, their attorneys or any other persons that they might undo these transactions. The talk testified to by Mrs. Powell proves nothing on this point. She heard Mary say she wanted Charles to have as much as she did; and Sarah said " I don't regret it now." A mere fragment of a conversation without showing the connection, and testified to years after it occurred, is pretty slim evidence to prove any fact. But the language testified to cannot be tortured even into a guess, that the girls knew they might set aside the gifts.

The investigation made at St. Albans Jan. 1, 1872, throws no light upon the question. In the first place the subject-matter of Mary's gift was not mentioned there by Charles, Judge Stewart, Mr. Somers, Mr. Beauclerk, or anybody else. The meeting was not appointed to consider that subject, but to examine Charles's account. It is true the account contained a reference to the gift ; but no witness can say that anything was said about it. The attention of Mary was called to the inventory of a large amount of real and personal property belonging to her, and Mr. Somers and Judge Stewart discussed values, as the examination went on.

Mr. Royce and his wife, who would naturally have an interest

for Mary, are ignored in the investigation. Judge Stewart before going to St. Albans had prejudged the case and determined to allow the account. He professed to act as Mary's attorney; but his appointment was void as she was a minor without authority to appoint an attorney. The time was the day before Mary's appointed marriage. Mary could know and appreciate but little of the business that was being done. It is absurd to conclude that Mary learned anything respecting her right to set aside her gift, or anything from which her consent to let it stand can be implied. The time, the place, the surroundings, the parties present, the parties absent that ought to have been present—all concur to show that her understanding of the business actually transacted, must have been quite meagre, and altogether less so, of business that was not attended to. Nor is the examination made Feb. 6, 1872, at Irasburgh of Charles's account by Sarah, aided by her counsel, Mr. Hyde, any more satisfactory. No one of the accounts of Charles that came under review at that examination, contained any reference to Sarah's gift. There is nothing to show that any mention was made of it by any of the parties present, nor that Mr. Hyde ever knew that such a gift had been made. Mr. Hyde's testimony was not taken as it doubtless would have been if it would show anything favorable to the defendants. There is nothing on which to ground the claim that Sarah had the benefit of disinterested counsel. She sought counsel for another purpose; she did not ask advice respecting the gift, and her attorney had no occasion to volunteer any. It is not enough to show the presence of an adviser. It must appear that the subject-matter, claimed to be protected on the score of disinterested advice, was up for consideration, and that counsel was given respecting *that*.

The endorsement made upon the settlement, "The above account having been examined and approved by our attorney Henry D. Hyde, we do hereby express ourselves as satisfied, and this account is settled as above," and signed by Mr. and Mrs. Wade, attests the scope of Mr. Hyde's examination, and limits the acquiescence of Sarah to that account alone.

The point to be made out is that Sarah and Mary *knew* their rights. Whatever knowledge Mr. Thompson or anybody else

might have, cannot be imputed to the girls. It is to be noted that this is the case of a gift; that the girls have received no advantage from their act. Accordingly the argument based upon the ground of lapse of time, loses much of its force. It is said in 1 Perry on Trusts, s. 467, that acquiescence will not be presumed from mere lapse of time, if the *cestui que trust* has *done nothing* to acknowledge the breach of trust, nor *received a benefit* from it. In *Murray* v. *Palmer, supra,* the bill was brought to set aside a conveyance made by a woman of full age, but ignorant of her rights, after the conveyance had stood, and the interest on the purchase money had been paid to her, for twelve years. The court held that she was not estopped by this fact. Many cases can be cited where a much longer delay has been excused ; and many to show that much less time has been sufficient to raise the bar. But the cases all show that lapse of time, standing alone, is an unsatisfactory defence to the establishment of a clear right. But there is another answer to this branch of the defence. The masters say : " From Charles's knowledge of the property, and the relations between him and his sisters, the masters are persuaded that he advised with and aided them more or less about their property so long as Mary lived, and Mrs. Wade so long as she lived."

The relations between Charles and his sisters were always of the most affectionate character. Mary gave expression and emphasis to this fact when she said as Mrs. Powell testifies, " that if he (Charles) should die, she should not wish to live." The whole tenor of the report indicates that at all times after the marriage of Mary and Sarah, as well as before, Charles held their unlimited confidence and affection. His technical discharge as their legal guardian, did not disturb the dominion he held over them, springing from their confidential and kinship relations. " Acquiescence goes for nothing so long as a man continues in the same situation in which he was at the date of the transaction." Kerr on Fraud and Mistake, 301.

The silence of Sarah and Mary since their marriage—the absence of all evidence that they or Charles ever made any allusion to the gifts, and the continued confidence that the girls reposed in

Wade *v*. Pulsifer.

Charles, that gave him, to some extent the continued management of their property, and at all times turned them to him, as their adviser; are facts that raise the presumption, in the absence of evidence to the contrary, that whatever acquiescence existed in the case is traceable to the same influence that vitiated the gifts when originally made. Under such circumstances their claim to relief would never outlaw nor grow stale. On the contrary their cause of action would be new every morning and fresh every evening.

It is said that the orators have an adequate remedy at law, and that chancery, therefore, has no jurisdiction of the suit. The court acquired a rightful jurisdiction to enjoin the distribution of the guardian's estate, and the removal of the assets beyond the jurisdiction of our courts. This, by the settled practice of the court, would be a sufficient ground upon which to retain the suit and accord proper relief. It may be that *some* remedy would be open to these orators at law; but it is not apparent that any such remedy would be adequate to meet the exigencies of the case. But the jurisdiction of equity, over the trust relations subsisting between guardians and wards, and other persons standing in fiduciary relations; to give relief against breaches of trust, is one of the most ancient, best settled and most salutary instances of the exercise of chancery power, known to the system of equity jurisprudence. The defendants further contend that the bill is multifarious, in that the claims of the orators represent distinct interests against a common defendant.

The technical learning displayed in some of the early cases respecting the subject of multifariousness in bills in equity, is not regarded with much favor in modern times. In ancient times the pleadings in equity conformed very nearly to the common-law system; and dilatory matters clogged the progress of causes to the great annoyance of the court as well as suitors. But from time to time, the courts, ever anxious to reach the very merits of controversies, have broken away from the restraints of technicality, until eventually all the proper subject-matters of allegation on the part of a complainant, which under the old system would find their proper place in the bill, replication, surrejoinder or surre-

butter were incorporated into the bill, or some amendment or supplement thereof; and all defences, that formerly appeared in any of the successive pleadings open to a defendant, were condensed into the answer. This simplification of the system of equity pleadings necessarily cleared away many of the technical and dilatory impediments that barred the approach to a consideration of causes upon their merits. A demurrer, however, is available now as formerly; but courts confine it to its proper scope, and require that it be interposed *in limine.* Its proper scope is to protect the defendant from making answer to the bill. If, therefore, the defendant submits to answer the bill, fully upon its merits, he is taken to have waived his technical protection. *Clark* v. *Phelps,* 6 Johns. Ch. 214.

There is no well-settled definition of multifariousness laid down in the books. Lord Cottenham, in *Campbell* v *Mackay,* 1 Mylne & Craig, 603, has discussed the subject with great learning and perspicuity. He says: " The cases upon the subject are extremely various; and the court in deciding them seems to have considered what was convenient in particular circumstances rather than to have attempted to lay down any absolute rule."

In Adams' Equity, 6 Am. Ed. 616, it is said that the rule forbidding the joinder of different matters in the same suit is a rule of *convenience only,* and is not binding, and may be dispensed with if the claims be so far connected that a single suit is more convenient.

The Master of the Rolls in *Coates* v. *Legard,* L. R. 19 Equity, 59, says: " The objection of multifariousness is a question of discretion to be determined upon considerations of convenience with regard to the circumstances of each particular case." The same doctrine is laid down in *Carroll* v. *Roosevelt,* 4 Edw. Ch. 211, and in Story Eq. Plead. s. 539.

The question in all cases where the objection is interposed, is whether the court can accord full and substantial relief to all parties in interest without embarrassing the chances for defense. But the objection of multifariousness must be taken by demurrer, and insisted upon before final hearing. Lord Redesdale, the highest authority we have upon the subject of equity pleadings,

says in *Whaley* v. *Dawson*, 2 Sch. & Lefr. 371, that the objection must be taken by demurrer, and that it is too late to complain after the cause has proceeded to a hearing. Sir J. WIGRAM, V. C. in *Benson* v. *Hadfield*, 4 Hare, 39, says that, except in special cases, this objection will not be allowed to prevail at the hearing.

Judge STORY, speaking for the Supreme Court says, in *Oliver* v. *Piatt*, 3 How. 412: "And at so late a period as the hearing, so reluctant is the court to countenance the objection, that, if it can get on in the cause to a final decree without serious embarrassment, it will do so, disregarding the fault or error when it has been acquiesced in by the parties up to that time. *A fortiori*, an appellate court would scarcely entertain the objection, if it was not forced upon it by a moral necessity." To the same effect, *Wellborn* v. *Tiller*, 10 Ala. 305.

The reason given in the cases why the objection should be taken *in limine*, is the saving of the expense of a trial on the merits. If, therefore, the defendant answer the bill fully on its merits and incorporates into his answer a demurrer for informality in the pleadings, but does not bring the case to a hearing upon the demurrer, he must be treated as having waived it. Some of the cases imply that a demurrer may be incorporated in the answer ; but it is manifest that this is inconsistent pleading. It is in effect answering the bill, and at the same time claiming to be protected from answering. Mitford, Tyler's Ed. 203, says a demurrer and answer may be joined, provided each relates to a *separate* and *distinct* part of the bill. Chancellor KENT says, in *Clark* v. *Phelps*, 6 Johns. Chan. 214: "It is a settled rule in pleading that a defendant cannot plead or answer and demur to the same matter—the former will overrule the latter. It is inconsistent for a defendant to say, he ought not answer to a bill, and yet to answer it fully. Lord Chancellor KING, in *Jones* v. *Earl of Strafford*, 3 P. Wms. 81, says : "As answering to the same thing overrules a plea, so *a fortiori* pleading or answering to the same thing overrules a demurrer."

But waiving this point, if the demurrer is allowed to slumber until all the expense of a trial is incurred, it is waived. In *Hendrickson* v. *Wallace*, N. J. 9 Reporter, 411, the vice chancellor says of· this objection : "As a general rule, a defendant must

avail himself of it by demurrer, or lose it forever. If he attempts to answer the complainant's case by answering on the merits, the objection will be considered waived, so far as he is concerned, and the court will proceed to make a decree regardless of it, if it can do justice to all parties."

In 1 Dan. Chan. 352, it is said that the "objection will be considered to be waived by a defendant who answers the bill." See also, *Underhill* v. *Von Cortlandt*, 2 Johns. Chan. 369. Now it is obvious that the defendant can stand no better by incorporating a demurrer into his answer than he could if he first demurred and then answered. He waives his technical defence in the one case as in the other. In *Cousens* v. *Rosse*, L. R. 12 Eq. Cas. 366, a demurrer to the bill on the ground of multifariousness was incorporated into the answer, the answer being full respecting the merits. The objection was first urged to the court on final hearing. Lord ROMILLY, M. R. said : "The suit constituted in this manner, is obviously multifarious, and like most suits so constituted, is in a most inconvenient and irregular frame ; but as objection has not been taken to it by way of demurrer, it is too late to do so now." This case seems to be on all fours with the case at bar.

If a demurrer had been interposed to the bill in this cause at the outset for want of technical formality, it would have been well taken. The gifts were several, and entirely independent of each other. If the suit had abated, two suits would have followed incurring the expense. The defense has in no way been hampered in the progress of the cause by reason of the misjoinder, and to overturn the suit at this stage is simply to delay judgment, not to avert it. No reason is apparent—none is urged—why a decree cannot be made according full relief to the parties in interest as effectually as it could if separate suits had been instituted.

We are justified, therefore, in holding, upon the doctrine of the cases, as well as the reason of the thing, that the cause shall not be arrested by a lurking fatality after the defendants have tried their chances on its merits.

The *pro forma* decree is reversed and cause remanded, with directions to enter a decree for the orators as per mandate on file.