Hunt, J.
The Pleadings.
These two actions were tried together. The several plaintiffs are daughters of John F. Robinson, the defendant. The controversy arises in regard to the proceeds and dividends of certain stock originally known as the Russell & Morgan stock, hereinafter more particularly described, which stock defendant, as guardian of plaintiffs, had received from the estate of plaintiffs’ mother, defendant’s wife,, and to which defendant • claims to have had an equitable title at the time of the mother’s death, and now claims a life interest by reason of agreements or declarations of trust made by the plaintiffs after they became of age.
The stocks now involved in the Lamkin case are 803% shares in the U. S. Printing Company, 508 shares in the U. S. Playing Card Company and 55 shares in the Oglesby Paper Company, par value $136,675, all standing on the books of the different companies in the name of Pearl Lamkin.
The stocks now involved in the Stevens case are 803% shares in the U. S. Printing Co. and 508 shares in the U. S. Playing Card Co., par value $131,175, all standing on the books of the company in the name of Caroline Stevens.
Prior to the commencement of this suit the defendant had possession of the certificates representing such stocks.
The plaintiffs both ask for the setting aside of all agreements and declarations made, and receipts and powers of attorney *5 given by them with regard to the original stocks or their proceeds, or the accounts filed by the guardian upon plaintiffs becoming of age, or the dividends which had been paid to the defendant as guardian, for a setting aside of all powers of attorney or agreements made by plaintiffs up to the time of the filing of the petitions herein, and also in effect, for the setting aside of confirmation by the probate court of the accounts filed by their guardian and a restatement of such accounts, and a general account by their father pertaining to such stocks and the dividends thereon since their mother’s death.
The grounds alleged therefor are that plaintiffs were not informed by the defendant of any of the contents and effect of the receipts, agreements and other instruments signed by them, that such knowledge was concealed from them, that they did not understand the effect of such instruments and had no advice pertaining thereto except from the defendant, and that they were at all times under the complete dominion and influence of the defendant.
Plaintiffs therefore ask for the cancellation of the agreement by which they gave their father a life estate in the dividends from such stocks and a judgment in the Lamkin case of $118,-003.49, with interest, and in the Stevens case of $120,755.04, with interest, as dividends collected and not accounted for by the defendant or expended for plaintiffs’ benefit. .
In the Lamkin case the money judgment prayed for consists of:
1st. Balance shown by final account of the guardian ................................. $ 28,444.21
2d. Dividends collected during the plaintiffs’ minority and not included in the final account of guardian ............................... 4,295.37
3d. Dividends collected since plaintiffs became of age ...............$89,560.96
Less an admitted credit of........ 4,297.05
Balance ........ 85,236.91
Total $118,003.49
*6 In the Stevens ease the money judgment prayed for consists of:
1st. Balance shown by final account of guardian ....................... $ 44,095.53
2d. Dividends collected during the plaintiffs’ minority and not included in the final account of the guardian 12,520.55
3d. Dividends collected since plaintiffs became of age ...................65,273.96
Less an admitted credit of ........ 1,135.00
Balance............ 64,138.96
Total......................$120,755.04
The defendant in effect- denies all the allegations of fraud and undue influence, and in-addition thereto claims that he had an equitable title to the original stock standing in the name of his wife at the time of her -death, because he had placed such stock in her name to be held in trust for the -benefit of himself, herself and their children, and under a mutual understanding that she was to make a will giving the said stock to him; and further that if he has no such equitable title and if the agreements, declarations, etc., of the plaintiffs, his two daughters, be set aside, that he be restored to his original marital rights in such stock by being given his distributive share as surviving husband, which he had as yet neither claimed nor received in the distribution of his deceased wife’s estate.
The plaintiffs in effect deny that the defendant retained any equitable interest in such stock and as to any distributive rights of their father, claim that he has conclusively waived such rights in their favor and that the defendant is now barred from assorting such rights by receiving the original stock as their guardian and accounting- therefor to them as such in the accounts filed in the probate court.
It appears from the evidence that at the same -time that these suits were instituted, John G-. Robinson, son of the defendant, instituted a similar suit against his father, except-that not hav *7 ing given his father a life estate in the stock, the dividends thereon were alone involved and that settlement of said suit was made before the trial of these actions. The terms of such settlement are not in evidence, although from statements of counsel it appears that John Gr. Robinson is now.in full charge of the circus formerly owned by his father. This can be considered only in weighing the testimony of the son.
The facts in this case extend over a long period of years and involve many details, some of which may be unimportant, and the facts can not be considered wholly chronologically without some confusion. At the risk of some repetition they will be divided into three statements.
In order to view the absolutely material facts it is necessary to first consider some of the general facts which only give such material facts their proper relative value.
The Subject-Matter.
The phenomenal growth of the stocks, the subject-matter of this proceeding, necessarily affected the conduct of the parties. Unusual prosperity ordinarily promotes carelessness in money matters between members of the same family.
On January 1, 1867, four men, A. 0. Russell, J. M. Armstrong, Robert J. Morgan and John F. Robinson, the defendant herein, bought the Enquirer Job Printing Office for the sum of $45,000, paying one-third cash and for the balance giving their note of $30,000 payable with interest three years after date. In the partnership thus formed under the name of Russell & Morgan, each had a one-fourth interest. The new firm was prosperous from the start. The $30,000 note was paid from the profits of the business and for a long time the profits were in great part put back into the business. In December, 1883, the firm was changed into a corporation known as the Russell & Morgan Company, with a capital stock of $400,000, divided into 400 ■ shares of $1,000 each. Each of the partners received 99 shares. The policy of adding a large part of the profits to the capital was continued until in April, 1891, the Russell & Morgan Company became the United States Printing Company, with shares *8 of $100 each. Each 23% shares of Russell & Morgan stock became 858% shares of United States Printing Company stock. The company continued to be prosperous and in July, 1894, a part of the business of the United States Printing Company was organized as a separate corporation under the name of the United States Playing Card Company, with shares of $100 each. The owner of each 858% shares in the United States Printing Company received in addition 508 shares of the new company. Such shares immediately took their places in the list of first class American industrials at about par value. United States Printing stock is now quoted about 90 and United States Playing Card Company above 130. Each year with few exceptions good dividends were paid. The above figures are used because they represent the separate interests at issue in this case, but in a general way it may be said that the original investment of $15,000 in 1867 now represents over two million dollars, or that each dollar of cash originally invested in January; 1867, in the Russell & Morgan firm, not counting the profits distributed from time to time, has increased more than 150 per cent, at either par or present market values, upon which for many years dividends have regularly been paid.
John F. Robinson, the defendant, although an equal partner in the original Russell & Morgan firm and taking part in its councils, devoted almost all of his time to the management of his father’s circus, of which he subsequently became the proprietor, but he gave the Russell & Morgan firm and its successors many thousand dollars worth of printing, beginning with ten to twenty thousand dollars and increasing to amounts of thirty to forty thousand dollars per year. In the management of the companies growing out of the original Russell & Morgan firm he has, until the present controversy, represented the shares derived from his original investment.
General Fiduciary and Family Relations.
The relation of debtor and creditor, trustee and beneficiary, existing between the defendant and the plaintiffs upon the issues joined (except so far as the statutes of limitations preclude *9 their consideration), necessarily involves not only such as were formally created, but also such relations of confidence, dependence or independence in family life as are presumed to have existed and continued to exist by reason of the relationship of the parties and such as actually existed from- the time of defendant’s first marriage up to the time of the present controversy.
A rapid sketch of the Robinson family life and of the character of its members, as disclosed by the evidence and by the conduct of the parties during the trial, is therefore necessary.
The defendant, John F. Robinson, was born November 4, 1843. His father was the proprietor and successful manager of the Robinson circus. The defendant from early age assisted his father. His brothers and sisters by marriage or management were closely identified with circus life. The defendant himself became proprietor and manager, enlarging the circus to meet the requirements of the times, and being as it is said the first circus proprietor to put a circus on its own railroad train. In April, 1866, the defendant married Catherine Heyward, an estimable woman. The defendant was at that time in his father’s employ, and after if not before he had become proprietor, his wife in addition to performing her full duties as wife and mother, assisted the defendant in the preparation of the paraphernalia and costumes used in the grand march and other features of the circus.
Children were born, but defendant’s life was the life of the circus and no attempt was made to divorce his home life from such influence. Mutual confidence in financial and other matters existed between the defendant and his wife. She had no property in her own right, and although prosperous and expecting so to continue, to protect himself and his family from the hazards to which both his life and property were subject in his business, he transferred to her $95,000 of Russell & Morgan stock. It was not expected by the defendant, nor intended by the wife, that the defendant should be actually deprived of the beneficial use of such stock or the dividends thereon. This transfer and its purpose were generally known by defendant’s broth *10 ers and his business associates, and was the subject of friendly conversation between them and defendant’s wife, and knowledge thereof became part of the general information of defendant’s household. The family made their home on Walnut Hills in Cincinnati, until in 1886 they moved to a farm or country place in Terrace Park, on part of which the circus had its winter quarters, and on the other part a commodious and spacious suburban home has ever since been maintained.
In August, 1889, defendant’s wife died after a sudden illness lasting only a few days, during which she was delirious. She left four children: John, aged seventeen; Kate, fifteen; Pearl, eleven; and Caroline, aged eight. The wife’s mother, with the assistance of a governess for the children and other necessary help, took charge of the household under the defendant’s direction for four or five years until she died. After that, competent housekeepers were employed until the daughters assumed charge. The children were given all the schooling which they craved. The plaintiffs were given several years of education in the Brown County Convent, followed by a summer in Europe, the European party consisting of the plaintiffs, their elder sister, a chaperon versed in foreign travel, and a companion who had been the plaintiffs’ governess and a member of the defendant’s household. The expenses of the whole party, including liberal purchases made by the daughters, were paid by the defendant.
The son, John G-., at seventeen or eighteen years of age, became an assistant bookkeeper of the Bussell & Morgan Company, a position made for him by request of the defendant. He filled this position but a short time as he preferred to be with the circus, with which he has been connected almost continuously ever since. He married when he was only nineteen without the consent of his father, with whom, however, the youth of the parties was the only objection. Defendant’s home was the home of the young couple for a couple of years until they voluntarily established themselves in their own home in the immediate neighborhood. Subsequently they have resided in a more pretentious residence district in Avondale. The son, except when *11 traveling with the circus, was an almost daily visitor at his father’s house in connection with the circus and other affairs.
The defendant devoted his time to his circus. Its atmosphere pervaded the household. The children inherited or acquired their father’s taste. From infancy, of their own preference, they spent weeks traveling with the circus, especially when it made trips to points like California. With the exception of the time spent at school, at the convent, in a trip abroad and freqiient trips to New York and elsewhere, or in the suburban life of the locality, their pleasures were taken in connection with the circus. A pecuniary interest in some of its minor privileges early given to them as additional pin money while with the circus, did not lessen its attractions to them.
As proprietor and manager of a successful circus of modern proportions, the father was more- or less of an autocrat in circus life. Engrossed in his circus, aesthetics and the amenities of social life and language were not cultivated by him. Although solicitous for his children’s welfare, and proud of them as his children, like many parents he considered and led his children to believe that when he was amassing wealth for himself he was doing so for them, and that they should s-o consider it and appreciate his efforts and be satisfied therewith, so, long as all present material wants were liberally supplied. He was not demonstrative in affection. Immersed in the influence of the circus, he was not competent to direct the social life of his children and made little attempt' to do so, except by occasional objections to their selections of companions and by providing them with proper chaperons. .The children may have been subject to some restrictions, but do not seem by reason thereof to have deprived themselves of any of the social pleasures within their opportunities, which seem to have been ample. Accustomed from infancy to have what a reasonable expenditure of money could buy, and in the circus atmosphere by which they were surrounded and which they loved, catered to as the daughters of the proprietor, unquestioned obedience and submission to any authority not profitable or agreeable to themselves, or implicit trust therein, did not become predominating character *12 istics of the plaintiffs. With at least ordinary keenness of in: tellect, they had confidence in their own judgment and the strength of will to promptly follow it, even against opposition, without any resultant mental depression from remorse or otherwise. The family had a normal and healthy, although entirely material, temperament. No member has that abnormal sense of duty or abnormal sensitiveness, with regard to family harmony, which sometimes causes meek submission by the generous and considerate to the selfish • and arbitrary, without personal profit, even to the extent of a ruination beyond the help of others, of their own and other interwoven lives. Upon the death of his wife the defendant, as the guardian of his children, received the Russell & Morgan stock held by his wife’s administrator, without claiming his distributive share therein, and collected the dividends thereon, using such dividends practically as his own. That their mother had died possessed of this stock and that in law they each had a one-fourth interest therein, and that their father claimed to be morally entitled to the beneficial use thereof, the children knew in greater or less degree according to their ages from earliest infancy. Their father made statements to them in regard to this, not full and formal statements, but such as are made in regard to matters already generally understood. Such knowledge was one of the facts in the family history, which became known to each member of the family as soon as they became intelligent enough to absorb and understand general family information, at first only in a general way and afterwards with more particularity. Their interest was referred to as Russell & Morgan “stuff,” although their interest had changed in form and greatly increased in value. What they did not know, they knew of and could have reduced to definite information if they had desired,- without even their father’s assistance and even without his knowledge. They were by no means strangers to their father’s original business associates and their families, still interested in such stocks. For the son and son-in-law, Stevens, after he became such, to claim any want of knowledge as to such interests can only be ascribed either to willful indifference or business incapacity. *13 The latter did not exist. The children knew that large dividends were being paid oh such stocks, and that such dividends were being used by their father as his own, although probably not knowing and at the time, money being plentiful, being indifferent to the exact amounts thereof.
After the children became of age the stock was transferred to them severally in proper proportions on the books of the company, and numerous powers of attorney, receipts and other agreements, giving numbers of shares and names of companies, were executed from time to time, by the children, by which the father continued to receive the dividends and use them as his own. The son in 1907 attempted to have the dividends paid to himself, and his father, after April, 1907, thereupon permitted him to receive and keep such dividends without objection. The son at that time made no claim whatever for past dividends.
The defendant kept his papers and conducted his correspondence at his home, except when on the road, and while the daughters were young their governess seems to have acted as his secretary, keeping a very general account of his expenditures in a book known to the family as the “wintering book.” Such account was by no means a detailed account nor was it a complete account. It was made up from bills turned over by the father and from his check book. This place of secretary was taken by the eldest daughter, Kate, after she finished her schooling, and filled by her until her death in 1901, or at least until her marriage in 1900, when the daughter, Pearl, took her place and filled it until her marriage in 1905, doing some of such work even after that. Pearl was able to use a typewriter and in taking dictation from her father, used an abbreviated longhand. Numerous letters pertaining to such stock were answered by her under her father’s direction. No secrecy was maintained by the defendant as to any of his business. The account book and papers pertaining both to his own and his daughter’s affairs were left in his desk, which was always open. When he wanted papers he would ask his daughters, who had filed them away, where such papers could be found.
Before the youngest daughter, Caroline, became of age, she met Horace Stevens, who for a couple of years had been con- *14 fleeted with, her father’s circus as an adjuster. His business was to obtain the necessary licenses, arrange all difficulties with local authorities, and adjust all claims for damages, engaging local' attorneys if necessary. He had been in different lines of business in New York City and elsewhere and had all the shrewdness and experience necessary for such a position. He was more than fifteen years older than Caroline, who was eighteen on December 24, 1899. He had been married some ten years before, but was getting his divorce -in a New York court. He obtained his divorce in 1899 or 1900, but is forgetful as to the exact time or year.
In June, 1901, Stevens became engaged to Caroline. Her father opposed this marriage, as he did not approve of her choicfe, getting however most of the information detrimental to Stevens from his son, John G., who was then managing the circus while on the road. Caroline, although less than twenty years of age, had complete confidence in her own judgment and demanded proof as to Stevens’ unworthiness. Not being supplied therewith promptly, she finally gave her father three weeks within which to produce it. At the end of that time, not being given such proof, she notified her father that she was going to marry Stevens, which she did on October 2, 1901, without advising her father of the time or place. Caroline and her husband then left-on a trip around the world, but she was taken sick in India. They returned to America, living in New York, Atlantic City and Palm Beach, Florida. In the last two places Stevens ran large hotels on small capital. The father after the marriage accepted the inevitable, and on their return to America resumed friendly relations with his daughter and her husband, Who in 1903 was again with the circus. Caroline and her children and husband thereafter made their home with the defendant, except when with the circus or away upon pleasure trips.
The daughter, Pearl, confesses to a fondness for horses, and found a congenial companion in Lamkin, a rider in her father’s circus. With the same confidence in her own judgment, although not quite so aggressively,' she married her choice on March 1, 1905, returning home the same evening to meet her *15 father who had. been informed of the marriage by a reporter of the papers. It was not long, however, before the defendant again accepted the inevitable, and Pearl and her husband made their home with the defendant. The father opposed these marriages because he had visions of his daughters marrying young men of business standing whom he eoulddielp, but he had taken no practical steps to accomplish this result. The marriages do not seem to have resulted unhappily. The whole family continued to travel frequently with the circus, each a.nd all finding personal profits in certain privileges pertaining thereto. The women of the family, consisting of the son’s wife and the two daughters, had recognized rights to certain reserved seat privileges. The son as assistant to his father and for many years subsequently manager of the circus, had greater opportunities than any one else, picking up as. he says a dollar wherever he could find it. The father seems to have objected to some of this picking up, but nevertheless permitted it to be done. The son-in-law, Stevens, had an interest in the side shows, restaurants and refreshment stands and other privileges, in addition to such profit as he could make as adjuster. The son, jealous of Stevens’ profits, some of which he -regarded as improperly obtained, refused to manage the circus for the year 1908. The father then resumed active management and during that year the profits enjoyed by Stevens, although neither has' offered any account thereof, are admitted to have been twenty or thirty thousand dollars. What perquisites Lamkin received is not known, but since his marriage he was often with the circus as a member of the proprietor’s family, and it is not improbable to presume under the family system of finance that it was .not without substantial profit to him also.
During 1908, the defendant, by reason of his son’s withdrawal, assumed active management of the circus, and not being in good health and finding it necessary to have many hypodermic injections daily, by his physician’s direction, took with him a woman nurse. Her presence and influence caused a disturbance in the harmony at that time existing in the family, engaged in the enjoyment of profits from privileges. The daughters re *16 turned home. To vindicate herself, as defendant’s counsel argued, from unjust criticism of the daughters, the nurse felt called upon to accept defendant’s offer of marriage, although he was many years her senior and a chronic invalid. Defendant’s marriage took place in December, 1908, thereby introducing another factor in the expectancy of the children, materially altering those pecuniary results which the father himself had taught the children to anticipate. The son with his attorney immediately went to the father’s house and the father being absent, went to the defendant’s desk in search of evidence, taking defendant’s account book and many of the papers offered in evidence by the plaintiffs in this case.
The daughters left the house, and with the usual family promptitude of action, on October 19, 1908, the present two suits were filed, together with one by the son, although the latter has been settled. It appears from the evidence that defendant’s father, when he died about 1888, left a considerable estate in which the defendant has still an interest, but from statements of plaintiff’s counsel, made in offering testimony, defendant’s alleged large indebtedness to plaintiffs, if now enforced, would probably bankrupt their father. As 'far as can be judged by plaintiffs’ testimony and conduct during the trial, this gives the plaintiffs no concern whatever, dominated as they manifestly are by a purpose to counteract the effect of the recently injected factor in their future expectations. Of course this is entirely immaterial in the consideration of plaintiffs’ present rights upon facts established, but to the extent that it is in the case, it affects their credibility. Except where corroborated by other reliable testimony, or by the probabilities of the truth under the circumstances of the case, the testimony of the plaintiffs must be weighed with a considerable allowance for great personal interest, bias and change of mental attitude. On the other hand, a father, who for twenty years has inculcated his children with the belief and expectation that what was his would be theirs, and induced them by reason thereof to at least temporarily waive in his favor the enjoyments of very valuable rights, can not expect his children to finally and permanently *17 relinquish such unasserted rights when he himself in his old age has subsequently changed conditions which although unenforcible were impliedly understood as to his enjoyment thereof.
Particular Facts.
On April 10, 1884, the defendant, John F. Robinson, transferred without pecuniary consideration to his wife, Catherine, 95 of his 99 shares in the Russell & Morgan Company, par value $95,000, and as it became necessary took from her general powers of attorney to represent such shares in voting and in the receipt of dividends. In August, 1889, Catherine Robinson died intestate. Four minor children were left: John, aged seventeen; Kate, fifteen; Pearl, eleven; and Caroline, eight. Gilbert R. Robinson, brother of John F., was appointed administrator, the husband necessarily waiving his right to such appointment. On December 28, 1889, the administrator filed an inventory showing an estate consisting of 95 shares of Russell & Morgan stock, and at the same time filed an account waiving all claim for compensation and showing the payment of funeral and other expenses by the defendant, who made no charge, and the transfer of such shares to the defendant as the duly appointed guardian of the minor children. In 1892, the eldest daughter, Kate, became of age and gave her father as her guardian a receipt for all dividends upon her stock.
On January 12, 1893, John G., the son, became of age. On April 15, 1893, John F. Robinson for the first time filed an inventory as guardian, showing receipt by him from the administrator of his wife, Catherine, of 95 shares of Russell & Morgan stock. At the same time he filed an account as guardian showing payment to John and Kate each, of 23% shares and the holding of 47% shares for Pearl and Caroline. With the account were filed separate receipts of John and Kate for all dividends collected during their minority. John G. gave an additional receipt for all stocks, dividends and moneys coming to him; such receipt being witnessed by Pearl and Dr. Belt, the family physician, which was not filed, and on March 1, 1894, gave a release and satisfaction piece tb the defendant for $2,506 *18 of dividends collected by the defendant to that date. All three papers were prepared by an attorney.
On November 28, 1895, Pearl became of age, and on April 24, 1896, her father as guardian filed another account in settlement of his account with her, showing the receipt of dividends on her stock of $38,682.75, and expenditures for board, school, clothing, etc., of $9,938.58. This account, in violation of the spirit if not the letter of Section 534 of the Revised Statutes, which prohibits the preparation of any account of an administrator, guardian, etc., by any clerk , or judge of the probate court, was prepared by two clerks of the probate court. Across the account in the handwriting of one of these clerks, .except the part which is in the handwriting of Judge Ferris, the probate judge, is the statement signed by Pearl, i. e.: “I have examined the above account of my guardian, and find the same to be correct in every particular and do hereby release said guardian from further liability on my account, and I request the court to confirm, the accountThe part italicized is in the handwriting of the judge.
Relying on his intimacy with Judge Ferris, John F. Robinson did not employ an attorney, but taking some crude data for the account, to the probate court, with his daughter, Pearl, appeared before the court, and the account above mentioned was prepared and filed. At the same time the court prepared and made an entry upon its journal reciting the presence of Pearl and her representations as to careful examination of the account and full understanding of all matters, and that the court was satisfied from the statements and proof that the account was correct, that Pearl understood said account and of her own free will asked the court to confirm the same; “that said account is herewith filed and ordered that said account be confirmed and the bondsmen released and discharged from any and all liability.” On the same day Pearl gave her father a separate receipt for all demands.
On May 27, 1896, the account filed April 24, after due ad- ' vertising, was again confirmed with many other accounts of *19 fendant, as guardian, transferred to Pearl on the books of the company 858% shares of stock in the U. S. Printing Company. On July 15, an entry was made in the probate court authorizing the guardian to transfer stock in the U. S. Playing Card Company, and on September 19 he transferred to her on the books of the company 508 shares. of U. S. Playing Card Company stock. On December 24, 1899, Caroline became of age and, following the precedent established with respect to Pearl, she was taken to the probate court and there was an entry made in the probate court similar to that of April 24, 1896, reciting the presence of Caroline, that she understood all matters, that she was satisfied and ordering the confirmation of the account. The account, however, was not filed until January 9, 1900. It shows receipts by the guardian of $54,446.75, expenditures for board, etc., of $10,349.22 and a net balance on hand of $44,-097.53. This account by direction of the probate judge was prepared by a clerk of the probate court, and a son of one of the witnesses for plaintiffs in this case, from crude data furnished by the defendant, and was O. K’d. by such clerk for confirmation. Across its face is the same endorsement as in Pearl’s case as to its examination, correctness, release from liability and request by her for confirmation. This is signed by Caroline. On January 11, 1900, Caroline gave her father a receipt in full for all claims, moneys, etc., but this receipt was not filed with the account which was again confirmed after due advertising, by the usual omnibus entry on February 28, 1900. The guardian never claimed any compensation as guardian of his children.
• Both Pearl and Caroline disclaim knowledge of the effect of that to which they consented in the' probate court, claiming that their father said it was a mere form. He did so consider it. In view, however, of their knowledge of the general family information as to their stocks and their own manifest intelligence, they must have been able' even at that time to understand the general effect of a simple explanation, which was all that was necessary to enable them to fully understand. It must be presumed in accordance with the record in the probate court that the probate judge, now their attorney, gave them such explana *20 tion as was necessary for them to understand their rights, and that he did not permit wards entrusted by law to his care to sign papers in his presence partly prepared by himself and his clerks, involving large amounts of money, which were not fully explained to them by him. On August 7, 1901, an entry was made in the probate court authorizing the guardian to transfer stock in the U. S. Printing Company to Caroline, and on August 10, 858% shares in such company, and on August 17, 508 shares of the U. S. Playing Card Company were transferred by the guardian to her on the books of the company. The letters to the company pertaining thereto were in part written by Pearl, by direction of her father.
At that time Caroline was engaged to Horace S. Stevens. The father, as stated before, did not approve of the man, and believed that Stevens ’ interest in Caroline ivas largely pecuniary. It seems -to have been assumed by all parties that Stevens at that .time shared .in the family information as to the vested rights of the children in valuable stocks. To test the extent of such pecuniary interests, if any, the father proposed and Caroline consented to the transfer by Caroline to her father of all her stocks. Accordingly on August 20, 1901, such stocks were indorsed in blank to her father. A few days thereafter, that is, on August 29, 1901, the defendant at his own suggestion prepared and signed a paper certifying that such certificates so indorsed in blank were indorsed without consideration, that such certificates belonged to Caroline, and that he desired and instructed such certificates to be delivered to her at his death to hold as her own property. Stevens was notified of the transfer of the stock by Caroline to her father, but not of the father’s declaration. He persisted in his suit for her hand, the father failed to dissuade the daughter, and the marriage took place without his consent, on October 2, 1901.
In October, the defendant caused Caroline’s stock in the United States Playing Card Company so indorsed in blank to be transferred to his name on the books of the company.
On November 15, 1901, the father caused John, Kate- and Pearl to sign a paper in which they acknowledged that the 508 *21 shares of U. S. Playing Card Company stock and the 858% shares of U. S. Printing Company stock transferred by Caroline to him, was known as her property and was, at his death, to be delivered to her, as would appear from a written memoranda by him attached to the certificates.
In November, 1902, exchanging 55 shares of Caroline’s U. S. Printing Company stock for 50 shares of the Oglesby Paper Company stock, which the defendant regarded as a better investment, he placed such stock in her name on the books of the company, but put the residue of her U, S. Printing Company stock in his own name. ITe exchanged 55 shares of Pearl’s U. S. Printing Company stock "for 50 shares of Oglesby Paper Company stock, placing both the residue of Pearl’s printing company stock and the Oglesby Paper Company stock in her name on the books of the company. Pie seems to have done the same thing with regard to the stock of his son, John, and that of his daughter, Kate, or her legal representative. What finally became of the stock of his daughter Kate is not disclosed by the evidence.
On December 20, 1902, Caroline, then at Palin Beach where her husband was running a hotel, being advised of the transfer to her father on the books of the company of her printing company and card company stock, wrote to her father demanding that it be transferred back to her name for the protection of herself and her children, stating however, that she did “not want that money now or the interest” thereon.
In June, 1903, Stevens being unsuccessful, terminated his hotel enterprise at Palm Beach, came to Cincinnati with his • wife, Caroline, and on the evening of June 13, 1903, prior to going to New York, came by appointment of the defendant to the defendant’s house with his wife. The same day the defendant had seen S. A. West, an attorney and neighbor living in the vicinity, a man of well known veracity and integrity, and with Pearl’s assistance finding the papers giving the necessary data as to the number of shares, names of companies, etc., requested such attorney to draw up a paper reciting in substance the transfer by the defendant to Caroline of 508 shares of U. S. *22 Playing Card Company stock and 803% shares of United States Printing Company stock and that in consideration thereof possession of such stock was to be held by the defendant during his life time with a right to collect all dividends and apply them to his own use; also to vote and represent such stock at all meetings of the companies, to sell such stock with the consent of Caroline and reinvest the proceeds thereof, with the absolute right thereto, if Caroline should die before the defendant, without leaving issue. No mention is made in such paper of the Oglesby Paper Company stock then in the name of Caroline.
Four or five copies of this instrument, one for each party, were prepared by the attorney and brought to the house that afternoon or evening. There was no secrecy as to what was to be done, other members of .the family being in an adjoining room. Stevens and his wife were asked by the father to look over the instrument. They went into an adjoining room to do so. Mrs. Stevens came back for some explanation. This was given. She returned to her husband in the adjoining room. Both then came back and without any objection, Caroline signed all the copies of the instrument, S. A. West and Caroline’s husband signing as witnesses. Stevens was given one of the papers so signed. He took it with him to New York that night, showed it to his attorneys and put it in his safe deposit box.
A few days thereafter, oh June 16, 1903,- the defendant, in pursuance of such instrument, transferred to Caroline' the 803% shares of U. S. Printing Company stock, and on June 18, 1903, transferred to her the 508 shares of U. S. Playing Card Company stock, and so it has remained until these actions were commenced.
On March 1, 1905, Pearl married without her father’s knowledge, and returning home the same day the father caused S. A. West to prepare papers pertaining to her 508 shares of U. S. Playing Card Company, 803% shares of U. S. Printing Company and 50 shares of Oglesby Paper Compiany stock, all of which were in her name on the books of the companies. Such instrument, like the instrument signed by Caroline, gave to the defendant the same rights in Pearl’s stocks as the paper signed *23 by Caroline gave to him in regard to her stock, except that the Oglesby Paper Company stock was not included in Caroline’s agreement. A consideration of one dollar and other good and valuable considerations is recited. On March 3d, 1905, Pearl signed enough copies of this instrument for the different companies and the parties. The son, John G-., and Dr. R. C. Belt, the family physician living in the neighborhood, signed as witnesses. Pearl already knew the purport of the instrument which her sister had signed and knew that the instrument which she signed was substantially of the same effect. At the same time with the same attesting witnesses she signed a receipt in full and an acknowledgment of full satisfaction by her father for all dividends collected on her stock in the three different companies. That day or on the following day at the suggestion of her father, she executed a will in favor of her father. In accordance with the statute and rights apparently fixed by such instruments signed by Caroline on June 13, 1903, and Pearl on March 3, 1905, the father and his daughters with their husbands have since acted, living almost continuously together,' and all drawing liberally in various ways from circus profits until the present controversy.
Prom the times after the children severally became of age, when their respective stocks were put in their several names on the books of the companies dividend cheeks came to the defendant’s house addressed to the children severally. These dividends were collected by the defendant by causing his children from time to time to either indorse such cheeks or execute powers of attorney authorizing him to collect such cheeks. Although the dividends came addressed to the children in envelopes of the different companies, they left such envelopes with their father’s mail.
It is probable that many of these checks, powers of attorney, as well as many of the receipts and other papers signed by the children at home,- except the formal instruments or declarations of June 13, 1903, and March 3, 1905, were not read carefully by their children, bpt signed by them because their father requested them so to do, but they at no time were ignorant that *24 very valuable stocks constantly increasing in value were inherited by them from their mother, that they had valuable rights therein, and although originally giving greater force than they now do to their father’s claim therein, never however recognizing it as a legal claim but only as a moral claim, they knew that the general effect and purpose of the different papers, receipts, etc., which they signed, was to enable their father to use as his own, without accounting therefor, for their benefit and his own as he might see fit, the dividends which were being paid on such stock, and they fully acquiesced in what he was doing. Such knowledge, acquiescence and consent existed in some degree immediately after they emerged from infancy, and increased as they became older and became more acquainted with the value of personal ownership and control of such property. It can not be presumed that after their marriage the daughters, especially the youngest, although their father was their trusted agent, relied wholly upon him for advice and counsel as to their pecuniary . interest and the effect of what they had done and what they were doing, or that their acquiescence in their father’s use of their property, without expectation on either side of an accounting therefor, was not influenced by considerations of actual and anticipated profits to themselves and their husbands as members of their father’s household and partakers in the incidental profits of their father’s business, or by considerations of high moral duty from which they now, by reason of their father’s marriage, consider themselves discharged.
Law of the Case.
Nearly three hundred pages of printed briefs have been submitted by counsel, largely devoted to a discussion of the law of the case. Comment on all of the cases cited would uselessly lengthen the present opinion necessarily long.
The Original Equitable Estate of Defendant.
The transfer of stock made by' the defendant to his wife, according to his own testimony although incompetent in regard thereto under Section 5242, Revised Statutes, differed in no ma *25 terial respect from the transfers and conveyances ordinarily made by a husband to his wife for the protection of the family. No enforcible legal or equitable interest in such cases is intended to remain in the husband. Any enforcible interest of the husband would defeat the object of the transfer in the event of financial disaster. For all future benefit to himself he relies on that control which mutual love, confidence and interest is expected to give him when needed and in which he is rarely disappointed when in need. If death, or mental or physical incapacity destroys the wife’s power to answer to such request, the law can not enforce it. 'In a high moral sense the husband may have a right to such expectancy, but the wife’s legal representatives are in law the sole judges as to whether the husband has forefeited such right, or to what extent it is to be recognized.
In the present ease, even if the defendant at the death of his wife had an enforcible equitable interest in the Russell & Morgan stocks, he is barred from asserting it, first by a failure within any possible statutory period of limitation to institute a suit therefor; and second, by permitting such stocks to be treated as his wife’s estate and subsequently and voluntarily receiving them as guardian of his children, and formally accounting therefor as such. 15 A. & E. Ency., 2d Ed., 76; In re Camp, 10 N. Y. St., 141; In re Cloud, Goebel, 177; McAllister v. Omstead, 20 Tenn., 210; Lessee of Merritt v. Horn, 5 O. S., 307; In re Morrison, 5 Pa. Dis. Rep., 571.
Defendant’s Distributive Share'in His Wife’s Estate.
As to any distributive share therein, the statute of limitations under any possible construction, now bars an action for the recovery thereof, and the defendant himself having, with full knowledge, included all the stocks in his inventory as guardian and in his accounts now final and unimpeachable by himself or his wards, is barred. Braiden v. Mercer, 44 O. S., 341; Woodmansee v. Woodmansee, 36 O. S., 18; Errett v. Howert, 78 O. S., 109.
Tt may be conceded as stated in Cox v. John, 32 O. S., 532-544, in regard to administrators, that the settlement had relation *26 only to the account between the administrator and the estate and not to the state of the accounts between him and the several distributees, but this is sufficient to preclude the defendant from now claiming that what he accounted for as the ward’s estate was in fact not so, but in fact his property by reason of a prior right.
Although any original beneficial or distributive interest of the defendant in his wife’s stock is now unenforeible, they must still be considered as causes if not the causes and adequate causes of plaintiffs’ acquiescing in their father’s use of the dividends from such stock, and therefore to that extent an elimination of the causes claimed, i. e., misunderstanding of fact and law, undue influence and domination. It is true that during plaintiffs’ infancy and possibly for some time afterwards, it was natural that plaintiffs should give greater force to their father’s claim, but there is no evidence whatever that after they became of age. they ever regarded their father as having an enforcible claim upon their stocks by reason of any beneficial or other interest created or recognized by their mother in their father’s favor, nor that their conduct was in any way influenced by being led to believe that he had any equitable or distributive interest therein, enforcible in any other manner than by an appeal to their own consciences. The most that plaintiffs can claim from the evidence is that they gave the matter little thought, but what thought they did give was in recognition of a mere moral right, or mere filial duty.
The Account oe the Guardian.
The fact that the guardian’s inventory and account are now conclusive between the parties, and can not be impeached, precludes the plaintiffs from the recovery of any dividends not included in the final accounts.
Upon the settlement of the account of the guardian by the probate court after plaintiffs became of age, the former legal relation of trustee .and beneficiary existing between them ceased, and the relation of debtor and creditor arose, or such other relation as the parties saw fit to create. Woerner on Guardians, *27 Section 109; 15 A. & E. Ency. of Law, page 81; Angell on Limitations, Sixth Ed., 175; Lambert v. Billheimer, 125 Ind., 519; Coleman v. Willi, 46 Mo., 236; Jones v. Jones, 91 Ind., 376; Wilmorfing v. Russ, 33 Conn., 67; Green v. Johnson, 3 Gill & John. (Md.), 389; Humphreys v. Mattoon, 43 Iowa, 556; Davis v. Ford, 7 O.; part 2, 104; Lease v. Downey, 9 C. C., 480.
Consequently as decided in the foregoing cases, unless created subsequently by action of the parties, the guardian after the ward becomes of age is not the trustee of a continuing or subsisting trust.
It follows, therefore, that as to amounts shown to be due by the accounts settled the relation of debtor and creditor alone was created between plaintiffs and defendant. A permissive use of specific chattels as well as of real property as distinct from a use under a claim of adverse title, is not within the statute of limitations, but there can be no such thing as a permissive use of a mere credit, i. e., of that for which one is only chargeable in the relation of debtor and creditor, such as to preclude the operation of the statute of limitations.
The accounts filed by the guardian did not attempt to account for the stocks of the wards, only for the money received therefrom. Except where such stocks have been lawfully reduced to cash by the guardian they remain as the corpus of the Avard’s estate not reduced to cash and not proper items of account. No matter how long the guardian, after the ward becomes of age, may retain possession of said stock, so long as such possession can be considered as merely permissive, or as being under a trust created expressly or impliedly by the parties, and there is no conversion or claim of adverse title, the statute of limitations does not begin to run against their recovery.
Whether the dividends collected by virtue of such possession Avould be stamped with the same character or as a debt, or Avhether there Avas to be any account therefor, would depend on the circumstances of the case.
In considering cases construing the statute of limitations, it must be remembered that the statute of limitations before 1831 applied to actions at laAV, birt that our present statutes, as part *28 of the code adopted in 1853, is applicable to all civil actions whether formerly, legal or equitable. Doyle v. West, 60 O. S., 438-445; Bryant v. Sullivan, 48 O. S., 205.
It is true that while it may be considered that the Legislature intended to limit all civil actions upon whatever cause of action founded except as expressly provided, nevertheless the statute proceeds to enumerate the causes of action to which particular limitations of time are to apply, and if a cause of action or ground of' action is not within such enumeration reasonably ■construed, as for example an action brought on a domestic judgment, or in mandamus, the statute like any other statute is inapplicable and should not by forced or strained construction be applied thereto. Graham v. Simon, Admr., 76 O. S., 77; Chinn v. Trustee, 32 O. S., 236.
Common law presumptions or equitable principles of laches as the case may be, are then the only limitations. AVhen the statute fairly applies there is no injustice in enforcing its provisions.
As stated in Wood v. Carpenter, 101 U. S., 135-143:
“Statutes of limitation are vital for the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights they supply its place by a presumption which renders proof unnecessary. Mere delay extending to the limit prescribed is itself a conclusive bar. The bane and the antidote go together.”
The Final Accounts.
The amounts shown by the guardian’s final accounts as due to plaintiffs could have been recovered by them in an action at law, The defendant was a statutory trustee. His duties are defined by statute. While the ordinary equitable rules applicable to any- trustee are in a general sense applicable to him, such rules are subordinate to the statute. Section 6269 casts upon the guardian, upon- the expiration of his trust, a statutory duty to pay to the proper person all the estate of his ward.
*29 As a mere statutory liability an action to enforce such duty would be barred by Section 4976 of the Revised Statutes in six years.
It is claimed that the confirmation of the guardian’s account has the force and effect of a judgment. Its effect is purely statutory, and the statute, Section 6284, simply gives it a conclusive effect as to the amount due, i. “such settlement shall be final between him and his ward,” except as expressly provided. Such statutory effect might not be given to it in the federal court. Pulliam v. Pulliam, 10 Fed., 23-27.
Sections 6175, 6187 and 6190, although providing more liberally for the opening of the settled accounts of an administrator, by necessary implication makes such settled accounts conclusive between the administrator and' the estate, except as provided by the statutes. McAfee v. McPhillips, 25 O. S., 374.
That the power of the probate court to order payment of amounts shown to be due is different, or must be differently exercised, and that any such order has a different effect in eases of administrators and in cases of guardians, may be conceded for the purposes of this case, as- there was no such order of the probate court in this case. The scope in regard to such orders of Sections 6020 and 6187 as to administrators', and Sections 6269 and 6275 as to guardians, and the cumulative remedy provided by Section 6195, applicable to both, need not therefore be considered.
If the law be that the settling of the final account of an administrator must be followed by a general order of distribution, and that in the ease of the guardian no order of distribution is necessary before a suit can be brought by a distributee, the settled accounts in either case so far as conclusive are equally so. As to the administrator the duty to pay arises expressly by reáson of the order, and as to the guardian, expressly by reason of Section 6269 without any order. The liability, created so far as .the statutes of limitation are applicable thereto, must be regarded as similar in both cases; i. e., statutory.
An account settled under the statutes' is not analogous to an account stated. The latter implies consent of both parties. Leake v. Leake, 75 Va., 792.
*30 A finding of fact or amount due in an equitable proceeding wb.erein issues pertaining thereto between parties have been judicially determined, although conclusive is not a judgment. Doyle v. West, 60 O. S., 438; Males v. Murray, 7 N. P., 615; Black on Judgments, Section 3, 115.
Much less therefore can an account settled in an ex parte proceeding be classed as a judgment.
It is claimed that such settled account is a specialty.
In the case of Stockwell v. Coleman, 10 O. S., 33, it was held that an action in this state upon a judgment of a justice of the peace of Indiana was an action upon a specialty, because such a judgment in that state ivas a specialty and full faith and credit thereto -must be given to it here, and that a right of action accrued upon the rendition of a judgment. Subsequently, as stated in Tyler v. Winslow, 15 O. S., 364-368, it was decided in Indiana that a judgment of another state (in one case Ohio itself), was not a specialty. Kimball v. Whitney, 15 Ind., 280; Niblack v. Goodman, 67 Ind., 174-181.
In the case of Tyler, Excr., v. Winslow, 15 O. S., 364, and Todd v. Crumb, 5 McLean, 172, and Graham v. Simon, 76 O. S., 77, it has been held that there was no accrual of a cause of action upon the rendition of a judgment, within the meaning of any of the causes of actions enumerated in the statutes of limitation.
In Fries v. Mack, 33 O. S., 52, the court said that it would so hold if necessary. In all of such cases, even in Stockwell v. Coleman, wherever the subject is mentioned it is said that in the ordinary sense of the term, specialty does not include judgment, and only by a forced construction can it be so considered.'
In Doyle v. West, 60 O. S., 438, by way of dicta in discussing the finding of the amount due in a foreclosure suit, the court says that “there is much authority- for saying that it is an action on a specialty,” citing Stockwell v. Coleman, 10 O. S., 33, Fries v. Mack, 33 O. S., 52, “though it certainly is not literally accurate to call a foreign judgment or the finding of an amount due a specialty,” “the usual definition of specialty being an instrument under seal.”
'The original reasons given for finding an action on a judgment or amotmt due to be an action upon a specialty having'been *31 so completely discredited, such, reasons are certainly not sufficient to find the account of a guardian or administrator as settled by the probate court to be a specialty, nor the right of action which accrued thereon to be the accruing of a cause of action upon a specialty, nor has it ever béen so considered.
There is more reason for saying that an action thereon is "for other relief not otherwise provided for,” to-wit; upon a debt evidenced by record, Graham v. Simon, 76 O. S., 77-82, referring to Doyle v. West, 60 O. S., 438, except that following the example of the Supreme Court on page 445 in Doyle v. West, in limiting Tyler’s Executors v. Winslow, 15 O. S., 364, to the cases identical therewith in facts, in the consideration of a cause or ground of action which they could not definitely place in either of two enumerated classes, the case of Doyle v. West should be likewise limited, and the mere confirmation of a guardian’s account in an ex parte proceeding to which the statute gives only a certain designated effect, should not be put on the basis of a finding of an amount due in an equitable proceeding wherein there are adversary parties and pleadings.
Especially is this so as an action on such settled account has always been considered as an action an account, to-wit, on an implied contract, the amount' thereof having or not having been conclusively determined, dependent upon the statutes. Woerner on Guardians, Section 109; 15 A. & E. Ency., page 81; Angell on Limitations, 6th Ed., 175; Green v. Johnson, 3 Gill & John., 389; Lofton v. Tanney, 13 Pet., 381-385; Kane v. Bloodgood, 7 Johns Ch., 90-113; Coleman v. Willi, 46 Mo., 236; Jones v. Jones, 91 Ind., 378; Lambert v. Billheimer, 125 Ind., 519; Humphrey v. Mattoon, 43 Ia., 556; Davis v. Ford, 7 O., pt. 2, 104; Lease v. Downey, 5 C. C., 480; Owen v. Watts, 24 S. C., 76.
Nor can the so-called wintering book kept by the defendant be considered as an account between the plaintiffs and the defendant, nor the entries therein as credits upon such accounts* for the purpose of precluding the application of the statute of limitations. Such wintering book must be considered in the sense in which it was kept, i. e., simply a memorandum of expenditures by the defendant, and whether the different receipts *32 and releases by the plaintiffs are to be given effect as such or not, they must be considered in determining whether the defendant recognized any continuing liability to plaintiffs and made such entries accordingly, or whether plaintiffs and defendant in any way recognized the expenditures by such entries as credits upon any continuing indebtedness. •
The evidence shows very clearly that neither the plaintiffs nor the defendant so considered such book or the entries therein.
It follows therefore that the right to recover the credits in favor of the wards shown by the final accounts of the guardian was barred in six years after the right of action accrued thereon, both as a statutory liability and as a liability existing upon an account.
It might have been argued that the final account of the guardian, signed and sworn to by him independently of any statutory effect given to it -oro its confirmation, constituted a. written acknowledgment of the amount shown to be due by such account, and was therefore a written agreement to pay the balance in accordance with the rule laid down in Deering v. Miller, 9 C.C. (N.S.), 393, affirmed 64 O. S., 548, and the cases cited therein- and that therefore the fifteen year limitation applies to an action for recovery of the balance shown to be due. On the other hand it might be argued that the guardian in signing and swearing to his account was performing a statutory duty and as to any other than its statutory effect such written acknowledgment so far as evidence of an agreement to pay or admission of amount due, must be taken in connection with plaintiffs’ written contemporaneous- acknowledgment of satisfaction, and further that such satisfaction given with the sanction and the approval of the probate court, charged with the duty of protecting its wards and indorsed on the accounts at the time of filing, possibly therefore became an unimpeachable part of such settlement. Lindsay v. Lindsay, 28 O. S., 157-164.
- A receipt in full satisfaction, without actual payment, can be explained and if the circumstances show such to have been the intention, has been held operative immediately as a gift voidable only upon the same conditions as a gift, but otherwise valid as a release. Holmes v. Holmes, 129 Mich., 412; Carpenter v. Soule, 88 N. Y., 251.
*33 If the release recites consideration, such recital for some purposes can be contradicted, i. e., in an action to recover such consideration, but mere failure to pay does not of itself defeat the operative words of the release. Shehy v. Cunningham, 81 O. S., 289.
If there is no recital, consideration can be shown aliunde. In this case the constructive waiver of compensation by the guardian is probably a technical although inadequate consideration. Such questions, however, have not been argued and are therefore merely referred to.
Conceding the facts to be as plaintiffs claim, such releases and receipts were not -simply voidable, but void, and from the -time of the settlement of the accounts plaintiffs had a right of action at law (Perry v. O’Neil, 78 O. S., 200). Although such releases and receipts have not the conclusive effect intended by the defendant, under the real facts in this case they must be considered as evidence of plaintiffs’ knowledge of -their rights and of the character and value of their estate, and making due allowance for the effect of fiduciary and confidential relations, they must further be considered as evidence of the permissive character of their father’s use of such balance shown by the accounts for his own benefit and in connection with such use as a repudiation of any trust.
Under the doctrine referred to in Long v. Mulford, 17 O. S., 485-509, Newton v. Taylor, 32 O. S., 399-413, equity sometimes engrafts a trust ex maleficio upon the title or possession of property obtained by wrongful or fraudulent means, but only where the title or possession is consistent with the existence and continuance of a trust, and where there is no adequate .remedy at law, is a trust such a subsisting and continuing trust as is expressly exempt from the statute of limitations. Pashall v. Hinderer, 28 O. S., 568-578; Carpenter v. Canal Co., 35 O. S., 307-317.
If the releases and receipts in full satisfaction in -this ease were void, necessarily no trust was raised, because the original relation of debtor and creditor created by the accounts and the coming of age of the minors was not disturbed and plaintiffs had an ade *34 quate remedy at law-until barred by the statute. If such releases and receipts were simply voidable and if relief therefrom could be given only in equity and only upon the theory of a trust ex maleficio, any title so obtained by the defendant to -the balance shown by the accounts, under the circumstances .of the case, was acquired in connection with a' repudiation of the continuance of any trust, and so far as such title was obtained by fraud or undue influence, the statute began to run upon -the discovery of the facts or termination of the undue influence. If the statute has not barred relief, a court of equity would still have to consider conflicting equities, and determine whether under all the circumstances such trust should now be enforced.
The Corpus op the Case.
As to the stocks themselves, i. e., the -corpus- of the wards’ estate, not the mere pecuniary credit existing in favor of the wards as against the guardian, different circumstances exist.
It is not necessary to discuss a case where after the wards- had become of age and after the accounts had been settled the guardian completely converted such stock to his own'use, because, such are not the facts of this case.
The stocks, except as ordered by this court, are now in the name of the wards who now have the legal title thereto. The guardian shortly after the wards became of age so placed the stocks. It is true that prior to the marriage of Caroline her stock was put in her father’s name, but at her request they were again put in her name, so that such temporary trust or conversion having been eliminated by the parties themselves, may be ignored. It was never intended by the parties that such transaction should ■change the relation of either of the parties to such stocks as between themselves. If either had any intention it was abandoned. The stocks of Caroline, therefore, except as they may be affected -by her agreement of June 13, 1903, may be regarded as always having been and being now her stocks. The stocks of Pearl have always been in her name since she became of age, and except as affected by her agreement of March 3, 1905, may be considered ¿s.hér stocks. Except as affected by such agreements or by the acts and Conduct 'of the plaintiffs; the plaintiffs have each'of them *35 always been and are now entitled to the dividends upon such stocks.
The Agreements.
In considering the effect of the agreements of June 13, 1903, and March 3, 1905, while the conditions surrounding the making of the two agreements vary, yet for the purposes of this case they may be regarded as. very similar. Caroline, although .younger, was more independently situated and less liable to the influence of her father than Pearl. Notwithstanding their general and even particular knowledge of their estates and the considerations already received and expected to be received from • their father, and although they had willingly acquiesced up to that time in their father’s claim of right to use as his own the dividends from such stock, and at that time had no intention of depriving him of the future use of such dividends, believing that his use of such dividends whether for his own use or theirs, had inured and would inure to their own ultimate benefit, nevertheless he was their fathér and had been their guardian, and had been allowed by them to manage their estates as he saw fit, and had or should have had a more intimate knowledge of the value to him and detriment to them, of the agreements which he asked-them to sign, and of the possible effects to them of such agreements under the ordinary viceissitudes of life. Although they had been of age several years when such agreements were signed and had married with their father’s disapproval, they had no reason to distrust him in business matters. He had been generous in his financial dealings with them, but so had they been towards him. Each in his or her way was not unmindful of the other’s welfare. He had no intention of defrauding them or of taking any undue advantage of -them, but believed that his children’s welfare under the circumstances existing, was best served by keeping control of their estates and using the dividends for the advancements of their present and future' interests through the present advancement of his own. They acquiesced in such belief and signed the papers which would carry out such scheme without any further personal signatures on their part. Occupying, however, sudh a relatipn toward the plaintiffs *36 the defendant failed, although not intentionally, in his duty toward them in having them sign papers which if not revocable, would preclude them no matter what happened or what he might do, from in any way exercising any control over their estate or receiving any benefit therefrom until after his death.
Certain arbitrary rules have been urged both by the plaintiffs and defendant, such as the presumption of emancipation by marriage or in one year after the wards become of age, and as to the effect of a conveyance from a child to a parent as distinct from the parent to the child and the recitals of consideration in the agreements, but as has been well said, except where rules are laid down by statute, a court of equity is not procrustean in its methods and refuses to be shackled in its administration of justice by any arbitrary rules. For a court of equity to determine a case upon a mere arbitrary rule, unless statutory, shows a want of conviction as to the real justice of its decree.
The relation of confidence or dependence between parent and child and the obligations of support, vary at different times in life. That condition which nature, family and legal duty creates at one time in life may be reversed at a later period. Equity recognizes the presumption arising from casual, arbitrary or other conditions, but as presumptions only. Equity ignores the mere form in which transactions may be cast and looks only to the substance and effect. In equity the status of trustee and beneficiary, of dependence and of confidence does not necessarily cease to have its influence immediately upon the determination of such status at law. So long as there is the slightest presumption that such influence remains, dealings between parties subject thereto can not be too closely scrutinized. Such dealings are absolutely necessary in some cases to preserve estates from sacrifice. No one except the former trustee, especially where family ties exist, may have sufficient interest in the beneficiary or have sufficient knowledge of the facts to do what is necessary; but the highest sense of honor, good faith and fair dealing is required to be exercised by the party occupying the superior position. Full disclosure and realization not only of facts but of the law, and absolute equality of freedom of action *37 is required, otherwise an unjust transaction will be presumed to be had by undue influence and will be set aside. No case cited, except such as, independently of statutory provision absolutely prohibits such dealings can state the duty of the trustee too strongly. An unanticipated benefit to the person charged in any way with such duties to another, or an unanticipated detriment to the other should be sufficient to cast the burden of showing that the original transaction was absolutely fair, open and beneficial to the injured party at the time it-was made. At the same time it must be remembered that such rules must be applied in accordance with the circumstances of the case. Equity permits of no arbitrary rules, except when a statute intervenes. There are cases in which honest trustees have suffered in dealing with dishonest beneficiaries. Equity examines the real facts as to such eases, and sustains or sets aside such transactions in accordance therewith. This in no way detracts from the rule that trustees can not contract or deal directly or indirectly, no matter how circuitously, with themselves. Caldwell v. Caldwell, 45 O. S., 512; Peath v. Longworth, 27 O. S., 159-195.
It applies only where parties are at law capable of dealing with each other, but by reason of the relation existing are not permitted so to do except upon terms approved by the highest sense of honor.
A transaction between persons between whom confidential relations, inequality of freedom of action, or inequality of knowledge, or opportunity of knowledge exists, while not necessarily void, nevertheless after such relation is clearly established if the terms of the transaction seem to' be unfair, there is a presumption of fact more or less strong in accordance with the actual character of such relation, that advantage thereof was taken, which however can be rebutted by showing that the transaction was in fact fairly made, and was in fact a transaction so just and equitable in its terms that a court of equity, with the knowledge possessed at the time when such transaction is attacked, can still say that the transaction was, at the time -it was made, just and equitable in its terms.
Ultimately, therefore, the validity of the agreement, in the absence of actual fraud in equity, is determined, not by the fact *38 of the existence of such relations between the parties, but upon the justice of the transaction, i. e., the inherent equities of the case (Berkmeyer v. Kellerman, 32 O. S., 239-253). Neither alone is sufficient except as the foundation of mere presumptions. Family settlements are subject to the same rule as other transactions. except that the parties thereto are presumed to be actuated by other than mere pecuniary considerations. To the extent that thej1' are pecuniary the court will not too closely scrutinize the amount, nor will the court limit the rules applicable to family settlements to eases in which there are controversies as to doubtful or disputed rights (Williams v. Williams, 2 L. R. Ch. App., 294-304). Family settlements from their very name are supported because of a general consideration or benefit of some kind, good or valuable to the family, but where the only benefit is to the person occupying a relatively superior position and at whose instance the transaction is had, 'it has no resemblance to a family settlement.
The equitable reasons which preclude the defendant from claiming any benefit by reason of the agreement of June 13, 1903, and March 3, 1905, apply with force increasing in the ratio of their earlier date to all the receipts, releases and other papers signed by the plaintiffs for their father, in so far as the plaintiffs by the intended effect thereof, alone are precluded from recovery of the amount referred to therein.
Counsel have been diligent in the collection of authorities applicable to transactions between persons, between whom the influence of confidential or fiduciary relations exists or is' presumed to exist. All havé been examined, but reading the statement of the rule in each case in connection with the facts thereof, no other conclusion is reached than that each transaction must be judged by its own circumstances, and that the crucial test of •the validity of each transaction, in ordinary language, is the honesty thereof and the justice of its terms. If it satisfies this test much is overlooked; if not, little is forgiven except as condoned by the parties interested.
Some of the authorities applicable to this question, cited by the plaintiffs, are: Pomeroy Eq. Jur., Vol. 2, Sections 951-961-962; Bispham Eq., Sections 234-235; Adams Eq., 184; A. & E. *39 Ency. of L., 2d Ed., Vol. 14, p. 194; A. & E. Ency. of L., 2d Ed., Vol. 15, p. 86; Berkmeyer v. Kellerman, 32 O. S., 239; Peath v. Longworth, 27 O. S., 159; Riddle v. Roll, 24 O. S., 572; Rammelsberg v. Mitchell, 29 O. S., 22; Wade v. Pulsifer, 54 Vt., 45; Ashton v. Thompson, 32 Minn., 25; Adams v. Cowen, 177 U. S., 471; Williams v. Davidson Estate, 133 Mich., 344; Hatch v. Hatch, 9 Vesey, Sr., 291; Hylton v. Hylton, 2 Vesey, Sr., 547; Chambers v. Crabb, 34 Beav., 457; Berdoe v. Dawson, 34 Beav., 603; Sercombe v. Sanders, 34 Beav., 382; Denton v. Donner, 23 Beav., 285; Hoghton v. Hoghton, 15 Beav., 278; Baker v. Bradley, 7 De G., M. & G., 597.
Upon the same question some of the authorities cited by the defendant are: Story Eq. Jur., Section 309; Perry on Trusts, Section 201; Beach on Trusts and Trustees, Section 140; Page on Contracts, Section 191; McAdams v. McAdams, 80 O. S., 232; Willis v. Baker, 75 O. S., 291; Taphorn v. Taphorn, 12 C. C. (N. S.), 180; Taphorn v. Taphorn, 6 N.P. (N.S.), 579; Hardy v. Van Harlinger, 7 O. S., 209; Christman v. Spink, 15 O. S., 600; Keck v. Sayre, 3 N. P., 45; Berkmeyer v. Kellerman, 32 O. S., 239; Jenkins v. Pye, 12 Pet., 241; Towson v. Moore, 173 U. S., 17; Ralston v. Turpin, 129 U. S., 663; Murray v. Hilton, 8 App. Ca., D. C., 281; Knox v. Singmaster, 75 Ia., 64; Adams v. Adams, 70 Ia., 253; Couchman, Admr., v. Couchman, 98 Ky., 109; Pasey v. Gardner, 21 W. Va., 469; In re Coleman Estate, 193 Pa. St., 605; Prescott v. Johnson, 91 Minn., 273; Wright v. Vanderpool, 8 De G., M. & 132; Corey v. Corey, 1 Vesey, Sr., 19; Stapilton v. Stapilton, 2 White & Tudor, 4 Am. Ed. L. C., 1675; Stapilton v. Stapilton, 12 Eng. Ruling Cases, 136-8.
Four Years Statute of Limitations.
It is claimed that the four years statute of limitations applies to the action brought by Caroline to set aside her agreement. The petitions of the plaintiffs were filed October 19, 1908. Caroline’s agreement was signed June 13, 1903.
There was no real intention of the defendant to defraud the plaintiffs in securing the agreements. For several years prior to the making by Caroline of her agreement she had been away, *40 from her father and with her husband, and as her letter shows had been watchful and insistent as .to her rights, and had in addition to her own knowledge the benefit and advice of her husband, a shrewd and experienced business man, and through him of the advice given to him by his attorneys. She therefore knew, or had the means of knowing exactly what she was doing. Except that she did not distrust her father’s honesty or financial judgment, and wished to be on good terms with him, any former influence which he might have had over -her had practically ceased. Enough remained, however, to make such an agreement voidable. When the means of knowledge are available and the circumstances invite examination, such facts are elements of equitable laches in the sense of negligent delay (Ency. of Law, 2d Ed., Vol. 1, 98-102), but to set the statute of limitations in operation, actual knowledge of the facts constituting the fraud is necessary. Stevens v. Sumners, 68 O. S., 421-441.
The same influence which causes a person to enter into an agreement may, if continued, influence him not to make that examination of law and fact which the circumstances would ordinarily invite, and would thereby preclude him from realizing what were and are his legal rights and the effect under possible contingencies of what he had done and was doing. Ordinarily ignorance of the law excuses no man, but that is not the rule in equity in the examination of the fairness of transactions between persons between whom any influence of confidential relations exist. Such influence is considered as^ a species of fraud. There must be a complete discovery of both fact and law and a termination of such influence before the statrite begins to run. Long v. Mulford, 17 O. S., 484; Edwards v. Daller, 10 D., 508.
Caroline, always alive to her rights and by reason of the advice of her husband, knew exactly what she had done and why she did it at the time, or in a short time after she signed her paper. Pearl probably did not know so completely. Probably with Caroline’s knowledge and freedom of action, at the time, her right to have her agreement set aside on the ground of mere fraud is barred by the four year statute.
If, however, as stated by Lord Cranworth in Smith v. Kay, 7 H. L. C., 751-770, any fraud actual or constructive is immaterial *41 and the right of action is founded entirely upon ordinary principles of a court of equity which protects an infant or any other person who is, from the relations which have subsisted between him and another person under the influence, as it is called, of that other, or if undue influence is not fraud, but is simply similar to fraud (Page on Contracts, Section 205), then the ten year statute might alone apply, and the right of action would not be barred.
Pearl’s agreement made March 3, 1905, was made less than four years prior to the filing of her petition.
Agreements Executory and Without Consideration.
It is not necessary, however, to finally determine whether the four years statute would apply to an action brought to set aside either of the agreements, inasmuch as they were entirely executory and without consideration. It is true that future benefit was expected by the plaintiffs from the defendant by reason thereof, but the defendant promised nothing and at the time relinquished no right and gave nothing. The only persons who did, or relinquished anything, were the plaintiffs. The stocks in Pearl’s case were, and in Caroline’s case ought to have been, so far as the defendant was concerned, in their own names. The stocks belonged to them. The transfer of Caroline’s stock to her was the performance of a prior legal duty, and therefore not a consideration. Withers v. Ewing, 40 O. S., 400-407; Page on Contracts, Sections 320-311.
The only effect of the instruments, so long as plaintiffs saw fit to let the agreements stand, was to permit the defendant to act as their attorney in the voting, etc., to collect in their names the dividends, and when collected, to use them as his own so long as he lived. Without the power to collect for plaintiffs the defendant’s right to use the dividends could not be exercised, except by the additional act of the plaintiffs. The giving of the power was without consideration and therefore, as a mere power of attorney or as an agreement, was revocable at any time by the plaintiffs. The collection of future dividends, and everything to be done in the future pertaining to the stocks, neces *42 sarily involved acts of the plaintiffs, either personal or by their father as their authorized representative under'such agreement. ' In either event, future action of the plaintiffs, either personal or by representative was alone called .for by such agreements. They were, therefore, except as mere powers of attorney, purely executory and as such, being without consideration, were not obligatory on the plaintiffs. No lapse of time would create in their father any right of action against plaintiffs upon such agreements. The plaintiffs, therefore, could at any time revoke such instruments and terminate their father’s future right to receive the dividends and use them.
It has been argued that the original trust under which the wife of the defendant held such stock, if there were such trust, and.if not, the defendant’s failure to claim his distributive right in his 'wife’s estate, constitute a moral consideration for the agreements of the plaintiffs. A moral consideration is not- sufficient to support an agreement,, unless such consideration would have constituted a legal consideration except for some inexorable rule of law, as for example, the statute of limitations. Cook v. Bradley, 7 Conn., 57; Anderson v. Seward, 40 O. S., 325; Lewis v. Simons, 1 Handy, 82-84; Cameron v. Fowler, 5 Hill, 306.
Where the party by his own acts has estopped himself from setting up rights or claims or defenses, such estoppel necessarily applies to their recognition either as moral or legal considerations.
Moreover, whatever value defendant’s original equitable interest, if any, and distributive right might have as a moral consideration, must under the circumstances be presumed to have been fully recognized and therefore extinguished, when the plaintiffs had the first opportunity for presumptively doing so, i. e., when they gave the releases and receipts for dividends collected during and after their minority, without other consideration. When otherwise, would it be fully recognized and extinguished.
Declarations of Trust.
It has been argued that the agreements of June 13, 1903, .and March 3, 1905, are declarations of trust. As declarations of *43 trust, want of consideration would not avoid them, but they are otherwise voidable for the same reasons as agreements would .be.
As trusts created by agreements, such trusts would fall with the agreements.
Before the owner can be held as a trustee for the benefit of a mere volunteer there must be a distinct and unequivocal declaration of trust. There should be an expression of an intention to become a trustee, not that the owner should use technical terms or language, but he should declare in unmistakable terms that he means to stand in a fiduciary relation to the object of his bounty. Flanders v. Blandy, 45 O. S., 116; Smith Estate, 144 Pa. St., 428; Stone v. Hackett, 12 Gray, 227.
The agreements under consideration clearly express the intention, and such intention was not to constitute the plaintiffs as trustees, simply to empower the defendant on behalf of the plaintiffs to do certain things in the future. So far as any trust was created the defendant and not the plaintiffs was created a trustee to hold possession of the stock. The defendant’s enjoyment of future dividends necessitated future acts of the plaintiffs individually or of the defendant as their attorney in fact, and the giving without consideration of such future dividends to the defendant. To hold plaintiffs as irrevocably bound so to do by construing such instruments as declarations of trust, would be the enforcement of a gift entirely executory by constituting the donor a trustee for the donee. This is never done. An ex-ecutory gift can not be so sustained. Flanders v. Blandy, 45 O. S., 108-115; Perry on Trusts, 5th Ed., Section 97 and notes; Meek v. Kettlewell, 1 Hare, 446; Estate of Webb, 49 Cal., 541-545.
Recital op Consideration.
It has also been argued that the recital of consideration in one of such agreements estopped the plaintiff signing such agreement, from setting up want of consideration.
The cases, holding that the recital in conveyances, of a consideration or a particular kind of a consideration, can not be rebutted by parol evidence for the purpose of avoiding the operative words of conveyance, nor for the purpose of changing the *44 line of descent of -the property conveyed, resulting from the character of the consideration recited to have been given, are not applicable to this case, inasmuch as there was no conveyance of the title to such stocks by such agreements, simply an agreement as to the disposition by plaintiffs of future dividends.
Moreover, as the agreements were made under circumstances which in equity required their cancellation, the recital of the consideration is immaterial. The recitals fall with the agreements, otherwise a court of equity would be barred from inquiry into a transaction by the form in which it was cast, and the parties unduly obtaining the agreement, by the mere form in which they made it, could defeat the exercise of equitable jurisdiction.
Dividends Collected.
It does not follow, however, that the plaintiffs can recover from their father the dividends which he did collect and use after the plaintiffs became of age, and before they revoked the powers given to their father by the various instruments which they signed.
When courts of equity have set aside transactions because they were had between persons not on equal footing, whether by reason of the existence of relations of trust of confidence, dependence or of former trust relations, it does not necessarily follow that an account for rents and profits is also ordered. That depends on the equities of the case. Pashall v. Hinderer, 28 O. S., 568-583; Malony v. L’Estrange, Beatty, 406-415; Muckallen v. Marum, 3 Dr. & W., 317; Pickett v. Loggan, 14 Vesey, 215; McLean, Admr., v. Miller, Excr., 5 N.P.(N.S.), 58-63; Ency. of Law & P., Vol. 1, p. 747.
The relations between the plaintiffs and the defendant, financial, family and otherwise, the mutual benefits, although in law not considerations, in connection with that knowledge, which from the time plaintiffs became of age grew in certainty and efficacy notwithstanding any influence, is sufficient to imply the full consent of the plaintiffs to their father’s use and appropriation of the dividends collected by him after they became of age, both *45 before and after such agreements and up to the time of plaintiffs ’ revocation of the powers given.
Under the conditions existing prior to the assertion by plaintiffs of their rights, plaintiffs were fully satisfied with their father’s use and appropriation of the dividends as declared, for his own and their present and prospective benefit as he might deem best.
The defendant has radically changed the family status existing. That may be a good reason why plaintiffs should not permit such use of dividends to continue, but can not alter the fact that the former use and appropriation were permissive, nor constitute any reason for the court now giving a different character to such use and requiring an account for the dividends so used when no such account was expected actually or impliedly by either party at the time of such use.
Without regard to any statute of limitations it would be inequitable for plaintiffs after their long acquiescence in their father’s use of the dividends, included in the accounts settled or collected subsequently, and in the status created by such acquiescence, which has resulted to their benefit as well as their father’s in manner and proportions now absolutely unascertainable by any court, to permit such status to be disturbed as to past transactions. The conduct of the parties, making due allowance for relations existing is amply sufficient .to establish that there w,as to be no accounting for dividends used, but insufficient to establish that such -use was to continue during defendant’s lifetime. Equity has fully performed its functions under all the circumstances of this ease when as in Berkmeyer v. Kellerman, 32 O. S., 239, it sets aside that only which is inequitable and permits and secures to the plaintiffs the future enjoyment of all the' privileges which their unrestricted ownership of the stock will vest in them.
It has been suggested in this case that if the instruments of June 13, 1903, and March 3, 1905, are simply executory and without consideration, a court of equity should leave the plaintiffs to their legal defenses thereto, but it is sufficient to say that the stocks and the dividends thereon since the commencement of *46 this suit axe now held by a trustee appointed by the court, and in order to make a proper disposition thereof, the finding of the effect of such instruments is necessary.
Other issues in this- case might be regarded as legal rather than equitable, but upon the ground of multiplicity of suits and other grounds, the court is apparently conceded to have jurisdiction to make all findings necessary to dispose of all issues raised in this ease.
The decree of the court will therefore be that the instruments of June 13, 1903, and March 3, 1905, be canceled, but that.no account be taken or recovery had of the dividends collected by the defendant prior to the revocation by the plaintiffs of such agreements.